Benjamin R. Wilson
James H. Power (*pro hac vice* to be submitted)
Clayton J. Vignocchi
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 513-3200
Email:  benjamin.wilson@hklaw.com
          james.power@hklaw.com
          clayton.vignocchi@hklaw.com

*Attorneys for Plaintiffs*
*Lincoln Harbor Enterprises, LLC and*
*Lincoln Harbor Yacht Club Condominium*
*Association, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LINCOLN HARBOR ENTERPRISES, LLC, and LINCOLN HARBOR YACHT CLUB CONDOMINIUM ASSOCIATION, INC.<br><br>    Plaintiffs,<br><br>  v.<br><br>HARTZ MOUNTAIN INDUSTRIES, INC., and PORT IMPERIAL FERRY CORP. d/b/a NY WATERWAY<br><br>    Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiffs, Lincoln Harbor Enterprises, LLC ("LHE") and Lincoln Harbor Yacht Club Condominium Association, Inc. ("LHYCCA") (collectively, "Plaintiffs"), through their undersigned counsel, and for their Complaint against Hartz Mountain Industries, Inc. ("Hartz Mountain") and Port Imperial Ferry Corp., d/b/a NY Waterway ("NY Waterway") (Hartz Mountain and NY Waterway, collectively, the "Defendants"), allege as follows:

## LOCAL CIVIL RULE 10.1 STATEMENT

1.      The mailing addresses of the parties to this action are:

Lincoln Harbor Enterprises LLC

1500 Harbor Blvd.

Weehawken, NJ 07086


Lincoln Harbor Yacht Club Condominium Association, Inc.

1500 Harbor Blvd.

Weehawken, NJ 07086


Hartz Mountain Industries, Inc.

400 Plaza Drive, P.O. Box 1515

Secaucus, NJ 07096-1515


Port Imperial Ferry Corp. d/b/a NY Waterway

4800 Avenue at Port Imperial

Weehawken, NJ 07086

## THE PARTIES

2.      Plaintiff LHE is a New Jersey limited liability company with a principal place of business located at 1500 Harbor Blvd., Weehawken, New Jersey.  LHE is the owner of one hundred percent (100%) of the condominium units comprising the commercial marina operated by LHYCCA on the Hudson River (the "Lincoln Harbor Marina") and owns in fee simple units

comprising two hundred and fifty (250) boat slips in the marina.  Each boat slip, together with its interest in the marina common areas and facilities, is a separate, individual condominium unit in LHYCCA, a condominium association, and constitutes a separate, saleable unit and tax lot.

3.     Plaintiff LYHCCA is the condominium association in Weehawken, New Jersey that manages the Lincoln Harbor Marina and its boat slips.  LYHCCA collects common area maintenance charges from the unit owners to apply toward the operation of the marina and its boat slips.

4.     Defendant NY Waterway is a New Jersey corporation authorized to do business in the state of New York.  NY Waterway is in the business, *inter alia*, of operating private for-profit commercial ferry boats transporting passengers between points on the Hudson River.  NY Waterway also owns and/or operates vessels transporting passengers between various points around New York Harbor, the Hudson River and the East River for special events such as baseball games and sightseeing cruises.

5.     Defendant Hartz Mountain is a New York corporation authorized to do business in New Jersey, with a principal place of business at 400 Plaza Drive, Secaucus, New Jersey.  Hartz Mountain is a major developer of real estate and is the primary developer within the Lincoln Harbor Planned Development ("Lincoln Harbor" or "PUD").

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. § 1331 as the Plaintiffs have asserted claims under federal statutes, to wit: Coastal Zone Management Act of 1972, 16 U.S.C. §§1451-1464, 46 U.S.C. §2101 *et seq.* and 46 U.S. §2301-2305.   Standing is conferred in part through Environmental Rights Act, N.J.S.A. 2A:35A-1 *et seq.* to assert claims against Hartz Mountain and NY Waterway based on conduct that harms the environment in violation of Rivers and Harbors

Act of 1899, 33 U.S.C. Sections 401 *et seq.* and Coastal Zone Management Act of 1972, 16 U.S.C. §§1451-1464.  This Court has jurisdiction over this case under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 because this action arises from one or more maritime torts occurring on or felt on navigable waters.

7.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's non-maritime claims to the extent that they are so related to the federal statutory and maritime claims that they form part of the same case or controversy.

8.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

9.      This Court has specific personal jurisdiction over the Defendants because Plaintiffs' claims arise from Defendants' tortious acts the effects of which are felt within the District, at the Lincoln Harbor Marina in Weehawken, New Jersey, and at other locations within the District along the New Jersey waterfront of the Hudson River.

10.      This Court also has general personal jurisdiction over Defendants, which are either incorporated or have principal places of business in New Jersey, and which conduct substantial and sufficient business within New Jersey to be considered "at home" in the State.

11.      Specifically, NY Waterway conducts substantial business in New Jersey in that it operates ferry boats and ferry terminals in New Jersey, lease, rents and/or owns property in New Jersey that is utilized by such Defendants in furtherance of its ferry business, sells ferry boat tickets and otherwise solicits and advertises for ferry boat passengers in New Jersey and markets ferry boat and related businesses in New Jersey.  The vessels operated by such Defendant consistently operate, dock, accept and discharge passengers in New Jersey.

12.      Hartz Mountain conducts substantial business in New Jersey in that such Defendant owns, operates, leases and develops property in New Jersey, including but not limited to property

located within Lincoln Harbor consisting in part of the private ferry terminal, and is headquartered in New Jersey.

13.     Plaintiffs reserve the right to a jury trial.


## FACTUAL  BACKGROUND

**Development of Lincoln Harbor**

14.     In or around 1986, Hartz Mountain entered into an agreement with the Township of Weehawken to develop the Lincoln Harbor PUD.  Lincoln Harbor is now a mixed-use, waterfront development along the Hudson River that contains residential, office, hotel and retail establishments.  Over the years since 1986 the continuing development of Lincoln Harbor has substantially expanded and has resulted in the significant financial enrichment of Hartz Mountain.

15.     In or sometime after 1986, Defendant NY Waterway, a private for-profit company, established its first and only route between Port Imperial in New Jersey and Pier 78 in Manhattan. Upon information and belief, in or sometime after 1989, Defendant NY Waterway began operating a second route between Hoboken and Battery Park City. Since that time, NY Waterway has substantially expanded its ferry service and presently operates commuter ferry boats from numerous locations on the east and west sides of the Hudson River.  Ferry boats owned and/or operated by NY Waterway now cross the Hudson River hundreds of times per day transporting passengers.

16.     On July 5, 1988, Hartz Mountain obtained a limited permit (permit No. 14905) from the Unites States Army Corps of Engineers ("ACE") authorizing the construction and installation of two ferry slips along what was formerly Pier H.  A true and correct copy of the permit (the "ACE Ferry Landing Permit") is attached hereto as Exhibit 1.  The ferry landing (the

"Hartz Ferry Slip") was approved July 1989 pursuant to the Resolution of Weehawken Planning Board Approving Lincoln Harbor Third Amendment to the Preliminary Plan, Revised Phase I Final Plan, and Phase II Final Plan dated July 26, 1989.

17.     Neither Hartz nor NY Waterway operated ferry service in the vicinity of Lincoln Harbor or at the Hartz Ferry Slip until after the Lincoln Harbor Marina was constructed and already in operation.

18.     The Lincoln Harbor Marina is clearly noted on the "Area Map" included in the ACE Ferry Landing Permit.

19.     The stated purpose in Hartz Mountain's application for the ACE Ferry Landing Permit was to "allow the existing Port Imperial Ferry to transport employees of Lincoln Harbor (located between Piers H and D) coming from New York in the a.m. hours, on its current vacant trip, to Weehawken.  The passenger flow would be reversed in the p.m. hours.  This would provide an alternate means of transportation for the employees." Ex. 1 at 11.

20.     The wording contained in the permit, "located between Piers H and D" is importantly specific.  The "Area Map" provided in the ACE Ferry Landing Permit clearly indicates that the "Lincoln Harbor Development" was significantly larger and more expansive than merely the commercial buildings between Piers H and D. Ex. 1 at 7.   The site plans in existence at the time of the ACE authorization clearly contemplated a much larger development in the PUD, including buildings to the north and south of Piers H and D, but the specificity of the ACE permit indicates that the ferry landing was intended for the employees of the then existing commercial office buildings located between Piers H and D.

21.     The Statement of Findings by the ACE concluded that the "proposed activity will not have a significant adverse effect on the quality of the human environment and as such an

environmental impact statement need not be prepared for this permit decision." Ex. 1 at 12. Specifically, the ACE Findings state in Paragraph 13 that "Since it is to be located between two existing piers, well within the pierhead line, no damage from existing wakes is expected." *Id.* at 12. The ACE Findings also state in Paragraph 14(c) with respect to "Extent and permanence of the beneficial and/or detrimental effects which the proposed activity may have on the private and public uses to which the area is suited": "No detrimental effects are expected to occur, since the facility would be transient in nature, and no permanent mooring would take place" (*id.* at 13).

22.     The ACE Ferry Landing Permit provides that "This permit does not authorize any injury to the property rights of others" (Ex. 1 at 4) and further, that the Army Corps may "reevaluate" the permitting decision "at any time the circumstances warrant," including but not limited to "[s]ignificant new information… which this office did not consider in reaching the original public interest decision." *Id.* at 5.

23.     Upon information and belief, Hartz Mountain never obtained in the first instance or failed to properly renew the required New Jersey Department of Environmental Protection ("NJDEP") permit. Despite Plaintiffs request for evidence of such necessary permit, neither ACE nor the NJDEP has been able to locate a NJDEP permit for the Hartz Ferry Slip.

24.     The Hartz Ferry Slip was constructed without any wake mitigation devices or structures that could protect neighboring properties from the wakes generated by the ferry operations at the Hartz Ferry Slip.

25.     Upon information and belief, despite the substantial development that has taken place at Lincoln Harbor since 1989, and the increased ferry schedule and the addition of a dedicated Lincoln Harbor route operated by NY Waterway at the Hartz Ferry Slip to service the Lincoln Harbor properties in which Hartz Mountain has substantial interests, Defendants have not

applied to the ACE for a renewed permit consistent with the current expanded purpose and exponential increase in the operations of the Hartz Ferry Slip at Lincoln Harbor.

26.     If the ACE had been provided with complete information as to the expanded purpose and scope of operations of the Hartz Ferry Slip, the ACE would not have nor could have reached a finding of "no detrimental effect".

27.     If provided with all relevant information as to purpose and scope of the Hartz Ferry Slip that would have been incident to such operation the ACE, would have required the permit applicant to mitigate the detrimental effects of the Hartz Ferry Slip.

28.     Hartz Mountain has taken no steps whatsoever to mitigate the wakes generated by the ferry operations into and out of the Hartz Ferry Slip, including, but not limited to, the construction of a wave wall, implementation of a no-wake zone and adoption of a ferry schedule purposely designed to mitigate property and environmental damage.

29.     Hartz Mountain has the financial ability to mitigate the wakes generated by the ferry operations into and out of the Hartz Ferry Slip without impacting Hartz Mountain's ability to continue to operate and/or benefit from the Hartz Ferry Slip.

**Present Operation of NY Waterway Ferries To/From Lincoln Harbor**

30.     The Hartz Ferry Slip constructed pursuant to the 1988 ACE Ferry Landing Permit adjacent the south-west portion of Pier H is sited on an approximately 150-foot-wide plot of submerged land (constituting part of the Hudson River, and identified in part as Block 34.03 Lot 4.21 on the Town of Weehawken tax maps) extending from the Hartz Ferry Slip out into the Hudson River adjacent to Pier H on its south side and over the full length of Pier H to the pierhead line (the "Hartz Ferry Channel"). Ferries arriving at or departing from the Hartz Ferry Slip traverse the Hartz Ferry Channel.

31.     The Hartz Ferry Channel is located within the pier-head line.

32.     Upon information and belief, the Hartz Mountain property lot in which the Hartz Ferry Channel is situated (Block 34.03 Lot 4.21) adjoins the Lincoln Harbor Marina property lot identified as Block 34.03 Lot 4.06.

33.     The Hartz Ferry Channel is located in the Lincoln Harbor PUD to the south of the Lincoln Harbor Marina and within 250 feet of the Lincoln Harbor Marina property line.

34.     The Hartz Ferry Slip is the property of Hartz Mountain and is controlled by Hartz Mountain.  The upland connecting the Hartz Ferry Slip to the mainland in the area of the sidewalk and Harbor Boulevard is the property of Hartz Mountain and is controlled by Hartz Mountain.

35.     The Hartz Ferry Channel is the property of Hartz Mountain and is controlled by Hartz Mountain.

36.     As a result of the substantial expansion of the Lincoln Harbor PUD since approximately 2002, the Hartz Ferry Slip not only serves the "employees of Lincoln Harbor between Piers H and D," the employees of UBS Financial Services Inc. ("UBS") and other businesses located at 1000 Harbor Boulevard as stated in its original purpose (acting as a limitation on the ferry activities), but now also serves the Riva Pointe Condominiums ("Riva Pointe," having 245 residential units) located at 600 Harbor Boulevard (formerly Pier H), guests at the Sheraton Hotel at 500 Lincoln Harbor Boulevard (a 350 room hotel located to the South of Pier H), the residents of Estuary Apartments (consisting of 582 units) at 1600 Harbor Boulevard (North of Pier D), as well as patrons of various restaurants and other retail establishments in the Lincoln Harbor PUD and individual members of the public generally who wish to use the ferry as a mode of transportation to Manhattan. In 2018, Hartz completed a new parking deck that is accessible to members of the public, for a fee payable to Hartz, that has rendered the Lincoln Harbor Ferry

Landing more accessible to members of the public than ever before. Prior to the new parking structure, there was only private parking in Lincoln Harbor. A true and correct copy of Hartz Mountain's site map for the current Lincoln Harbor PUD is attached hereto as Exhibit 2.

37.     Additionally, according to Hartz Mountain promotional materials and news articles, the Lincoln Harbor PUD is being further expanded by a residential development of 247 units at Pier D that has been completed and filled with new occupants, a forthcoming Whole Foods Market to the West of Harbor Boulevard, an additional 586 unit residential development at 800 Harbor Boulevard, and various other residential and commercial developments.  A true and correct copy of the Hartz Mountain promotional material is attached hereto as Exhibit 3.[1]  Upon information and belief, the Hartz Ferry Slip at Lincoln Harbor will serve the residents, employees and patrons of all these expansions of the PUD. The Hartz Ferry Slip is highlighted prominently in all promotional materials and site plans.  *Id.*

38.     All of these developments are intended to and will further enrich Hartz Mountain. Defendant Hartz Mountain directly benefits from a consistent ferry schedule operating ferries to Lincoln Harbor, including increased residential and commercial property values as well as increased rental income.

39.     For example, upon information and belief, Hartz Mountain is a party to a long-term commercial lease with UBS, which requires the operation of the NY Waterway ferries for the convenience of UBS employees.

40.     According to the NY Waterway website, as of August 15, 2018, the current ferry schedule for the Hartz Ferry Slip runs on weekdays every 15 minutes during rush hour (between 7am and 10am, and between 4pm and 8pm), and every 20 minutes during non-rush hour times

---

[1]*See also* https://www.cityrealty.com/nyc/market-insight/features/future-nyc/800-new-rental-units-rise-weehawken/16502

(between 10am and 4pm, and between 8pm and 11pm).[2]  This schedule totals 89 one-way trips back and forth every weekday.[3]

41.     Upon information and belief, the current ferry schedule for the Hartz Ferry Slip is required by contracts between Hartz Mountain, UBS and NY Waterway jointly or severally (such contract or contracts, together the "Hartz Ferry Contract").

42.     Upon information and belief, the Hartz Ferry Contract specifies the passengers whom NY Waterway must service by the current ferry schedule for the Hartz Ferry Slip.

43.     The frequency and speed of the ferries entering and departing the Hartz Ferry Slip generate unreasonable and destructive wakes that enter the Lincoln Harbor Marina every fifteen to twenty minutes.

44.     The NY Waterways ferries entering and departing the Hartz Ferry Slip generate long period wakes in the range of one to ten seconds, with typical rush hour periods of 2.0 to 5.0 seconds.

45.     As the southern exposure of the Lincoln Harbor Marina is un-protected because the original design criteria did not require such protection (further discussed below) and because Hartz has failed to provide any wake mitigation whatsoever along the northern boundary of the Hartz Ferry Channel, these constant wakes generated by activities associated with the Hartz Ferry Slip have rendered the Lincoln Harbor Marina unusable for marina use and such daily excessive wakes have likely degraded the supporting pier structure of the Riva Pointe condominiums. These constant wakes enter the Lincoln Harbor Marina through (1) the entrance to the Lincoln Harbor Marina and (2)  from the Hartz Ferry Channel under Riva Pointe pier and into the Lincoln Harbor

---

[2] http://www.nywaterway.com/LincolnHarborWeehawkenRoute.aspx#weekday

[3] The weekend schedule includes 92 one-way trips back and forth on Saturdays and 69 trips on Sundays.  See *id.*, nt. 1.

Marina.

46.     Hartz Mountain and NY Waterway act in concert to operate the Lincoln Harbor ferry schedule for the transportation of Hartz Mountain invitees (including but not limited to UBS employees) to and from the Hartz Ferry Slip, the result of which is the unsafe and unseamanlike operation of the ferries which are a direct and substantial cause of the damaging wakes.

47.     Hartz Mountain, as property owner of the submerged lands and connecting upland where the Hartz Ferry Slip is located and operated, and as the owner of the submerged lands of the Hartz Ferry Channel parallel to the entire length of Pier H and Riva Pointe where the ferries arrive and depart, is responsible in whole or in part for the ferry operations at the Hartz Ferry Slip.

48.     As a result of the Hartz Ferry Contract with NY Waterway, Hartz Mountain is responsible in whole or in part for the ferry schedule currently in place for Lincoln Harbor which requires reckless and unsafe speeds that cause dangerous and damaging wakes

49.     Hartz Mountain and LHE are neighboring property owners and, as such, Hartz Mountain owes a duty to LHE to not unreasonably interfere with LHE's use and enjoyment of LHE's property.

50.     Notwithstanding the fact that Lincoln Harbor Marina would be deemed unusable for marina use due to the unmitigated and unreasonable wakes generated by the ferries entering and departing the Hartz Ferry Channel, NY Waterway's negligent and reckless ferry operations up and down the Hudson, including the Hartz Ferry Slip Operations, have destroyed the Lincoln Harbor Marina wave screen (discussed below), which was designed and installed to protect 850 feet of the marina's eastern exposure from wakes generated by marine traffic on the Hudson River. The loss of Lincoln Harbor Marina's wave screen, in addition to the unmitigated and unreasonable wakes generated by the Hartz Ferry Channel, have caused extreme physical damage at significant

economic loss  and have rendered Lincoln Harbor Marina unusable for marina use.

**The Lincoln Harbor Marina**

51.     As part of the Lincoln Harbor PUD development, LYHCCA's predecessor, Sloan Marine Associates, L.P. ("Sloan"), was authorized to construct and develop the Lincoln Harbor Marina between Piers D and H in the PUD.

52.     Hartz Mountain was the owner of the property at the time Sloan applied to the NJDEP for a Waterfront Development Permit ("WDP") to build the Lincoln Harbor Marina.  This NJDEP WDP ("DEP Permit") was issued in April 1987 to Sloan as applicant and Hartz Mountain as "Owner," with the condition that the wave screen slips of the marina be used to accommodate sightseeing tours, fishing boats, and/or other access opportunities open to the general public.  A true and correct copy of this DEP Permit is attached hereto as Exhibit 4.

53.     A safe and functional Lincoln Harbor Marina is the gateway where the general public gains access to allow for use and enjoyment of the Hudson River and related water-dependent activities.  Hartz Mountain's and NY Waterway's activities with respect to the ferries improperly and impermissibly thwart the intentions and objectives of the NJDEP in making public access to the Hudson River and waterfront activities part of the DEP Permit.

54.     In response to an opportunity for public comment provided by the ACE concerning the construction of the Lincoln Harbor Marina, comment was received from the Towboat and Harbor Carriers Association of New York/New Jersey with respect to the planned construction of a wave screen at the marina.  In response, Sidney Johnson, a world-class marine engineer, prepared a detailed response, which is attached hereto as Exhibit 5.

55.     As noted in Johnson's response, when planning to build the wave screen at Lincoln Harbor Marina, an assessment of the realistic, maximum wake environment possible at the time

was undertaken.  Based on observation at that time, no waves were observed that were over 18 inches and all such wakes were "short period" wakes ranging between 0.8 and 1.1 seconds.  Ex. 5 at 1.

56.     In its wave screen analysis for the marina to be built, Johnson summarized boat wakes observed throughout the day.  Ex. 5 at 6.  Not a single ferry boat was observed – only an occasional tug or tour boat creating minimal wake.  *Id.*  All passing boats were traveling up-river or down-river in front of eastern face of the Lincoln Harbor Marina site. As there was no Hartz Ferry Slip, there were no boats observed that passed across the southern exposure of the property.

57.     Based on the above, Johnson engineered a wave wall that far exceeded what was required by the wake environment in the vicinity of Lincoln Harbor Marina at the time.  Johnson's wave wall was designed to tolerate wakes over and above what was expected and reasonably contemplated to occur based on the number, frequency and types of vessels in operation on the Hudson River at the time.  Further, Johnson's wave wall design focused on the marina's eastern exposure as all traffic and wake-sources originated from the east and, at the time, there was no need to protect the marina's southern exposure from existing or even expected future vessel wakes.

58.     Hartz, as owner of the Lincoln Harbor Marina property at the time the marina was being designed and as signatory to Lincoln Harbor Marina's DEP Permit, had knowledge of the marina's design and the wake conditions which the marina was designed to tolerate.

59.     Construction of the Lincoln Harbor Marina was completed in 1989.  Plaintiff LHE purchased the majority of the slip units in LHYCCA from Sloan's successor-in-interest in 1998 and has subsequently purchased all the remaining slip units in individual transactions.

60.     Notwithstanding the original construction in Lincoln Harbor Marina of the Sidney

14

Johnson designed 700-foot long wave screen along the east and south faces of the fixed G Dock[4] and the complete replacement of the screen sheeting and the reinforcement of the pier in 2005 and 2012, significant failures appeared around 2015 and by October 2018 the steel sheeting was not connected or not present along the south face or most of the east face wave screen, many of the wave screen piles were found to be in severely deteriorated condition, and the decking of the wave screen above south face and nearly all of east face was in a failed state and unusable.  The only section of the steel sheet wave screen remaining by the end of October 2018, along with usable decking, had been protected by the GCS 135 barge (described below).  As a result of the failed wave screen and the unmitigated wakes generated by the Hartz Ferry Channel operations, 100 percent of the floating pontoon boat slips in the marina have suffered extreme wave damage and all have been rendered unusable and have been removed and scrapped at high cost (including lost income) to LHYCCA and LHE.  A true and correct photograph of the sunken boat slips is attached hereto as Exhibit 6.  This destruction is not unique to Lincoln Harbor Marina as the devastating effects of NY Waterway ferry wakes can be similarly seen at Newport Marina in Jersey City, NJ where wakes contributed to the condemnation of the marina, main pier and restaurant.

61.     In order to comply with the condition of the DEP Permit, which requires allowing access to sightseeing tours, fishing boats, and/or other access opportunities open to the general public, to mitigate the damage being caused by Hartz and NY Waterway, and  to protect the Lincoln Harbor Marina from continuing and further damage from Defendants' excessive and destructive wakes, Plaintiffs temporarily berthed a steel tank barge "GCS 135" (300' long x 43.3' wide x 19.3' depth) along the remaining east face wave screen in the vicinity of slip G-1.  A recent

---

[4] A 850-foot-long "U"-shaped fixed pier wave screen comprised of three faces – north, east, and south; The wave screen design consists of one plumb and one batter pile at each bent with a total of 63 bents every 11 -15 feet; the piles are 24 inch diameter steel pipe piles; along the east and south faces, the screen consisted of steel sheet piles connected at 3 points along the face of the piles with horizontal wales; the north face screen consists of a timber close pile wall.

photograph of the barge and sunken wave screen slip is attached hereto as Exhibit 7.

62.    However, the berthing of barge GCS 135 was a temporary solution to the continual and ongoing destruction at Lincoln Harbor Marina caused by the NY Waterway ferry wakes and the barge has been removed from its prior location. It remains on site in connection with continuing removal of the accumulated damaged infrastructure at the marina, as a construction support barge and in connection with the desired repair and renovation of the marina property.

63.    In late October and early November 2018, to mitigate the ongoing harm, Lincoln Harbor Marina reinforced and improved the northeast section of the fixed G dock in order to continue to provide public access opportunities, including dinner cruise and sightseeing operations, while Lincoln Harbor Marina continues to explore solutions to the repair and protection of the rest of the marina infrastructure.

64.    Lincoln Harbor Marina desires to re-build the wave screen and replace the boat slips, but Lincoln Harbor Marina cannot afford to do so unless a full-depth wave screen is built to replace the former wave screen and wake mitigation is provided along the marina's entire southern exposure. Without a change to current ferry operations, the only way for Lincoln Harbor Marina to be restored to a usable and safe marina basin is if sufficient wake mitigation is provided for commensurate with the increased activities of NY Waterway in the vicinity of Lincoln Harbor and the Hartz Ferry Slip operations that far exceed the scope of the ACE Ferry Landing Permit.

**Liability of NY Waterway and Hartz Mountain for Public and Private Nuisance and Damage**

65.    In addition to the Lincoln Harbor ferry schedule, which creates the worst wakes in and around the Lincoln Harbor Marina, NY Waterway otherwise operates hundreds of ferry trips each day on various other routes along the Hudson River at frequencies and speeds which contribute to wake damage incurred by Plaintiffs and other members of the public along the

Hudson River waterfront, resulting in property damages, loss of use, and nuisance, as set forth further below.

66.     NY Waterway presently operates the vast majority of commercial ferry boats that operate on the Hudson River in New York Harbor, and its ferries comprise the majority of commercial and non-commercial vessel traffic on the Hudson River at any given time.  Despite NY Waterway's role in transporting commuters and visitors to and from the Hudson River waterfront, the public need for ferry transportation by a private for-profit company must be balanced with the property rights of others, as well as the public good (including environmental interests), through operation of the ferries at safe speeds and along appropriate routes.

67.     Upon information and belief, NY Waterway operates approximately 34 ferry vessels each with passenger capacity between 97 and 399 passengers.  The design defects of the ferry vessels used by NY Waterway were well known by NY Waterway and are a significant contributing factor to the damage being caused by the wakes of these vessels.  NY Waterway opted for ferries with speed and wakes over ferries designed to mitigate damage to property and the environment.

68.     NY Waterway continuously, systematically, negligently, intentionally and with reckless disregard for the safety of others and in violation of maritime law, federal and state statutes, rules and regulations has created dangerous and damaging wakes that have caused injuries, accidents and substantial property damage to other vessels, riparian property owners/lessees, including marina owners, dock owners, boat slip owners and/or lessees, and recreational and commercial users of the Hudson River.

69.     NY Waterway has caused and continues to cause dangerous and damaging ferry wakes in the vicinity of Lincoln Harbor Marina, including in the Hartz Ferry Channel, as a result

of its operation at improper speeds, by use of vessels which are unfit for service as ferries, in manners contrary to sound and prudent seamanship, and along routes not designed to minimize the creation of dangerous and damaging wakes.

70.     Hartz Mountain is jointly and severally responsible for the dangerous and damaging ferry wakes caused by NY Waterway in the vicinity of Lincoln Harbor Marina because Hartz Mountain has purposefully contracted for such operation by NY Waterway and intentionally, negligently and with systematic disregard for the property and safety of others has permitted such operation on and to and from its own property at the Hartz Ferry Slip and in the Hartz Ferry Channel.

71.     Hartz Mountain and NY Waterway operate, control, conduct and benefit from the ferries at the Hartz Mountain Ferry Slip as part of, and in furtherance of a joint enterprise.

72.     NY Waterway and Hartz Mountain have been expressly informed and have had notice and actual knowledge of the dangerous and damaging wakes caused by the operation of the Hartz Ferry Slip and Hartz Ferry Channel and the ferries operated on the Hudson River and in the vicinity of the Lincoln Harbor Marina far beyond what is allowable under the ACE Ferry Landing Permit and general maritime law and applicable federal and state statutes governing wakes and vessel operations.

73.     NY Waterway and Hartz Mountain have been expressly informed and have had notice and actual knowledge that such dangerous and damaging wakes have caused and continue to cause on-going substantial personal and property damage to Plaintiffs and to individuals vessels and marina property in the Lincoln Harbor Marina and elsewhere with respect to commercial and recreational usage of the Hudson River.

74.     Such actions by Defendants have diminished the commercial and recreational use

of the Hudson River at Lincoln Harbor Marina and the value of Plaintiffs' businesses and properties at Lincoln Harbor Marina.

75.     Defendants have diminished and in some cases deprived the general public of its right to personal enjoyment and recreational use of the Hudson River.   The Public Trust Doctrine as it pertains to protection of the rights of the public to access and use the Hudson River has been violated by the Defendants' activities in that the illegal, excessive and damaging wakes have diminished avenues for public access to the Hudson River including via the piers, wave wall, and fixed and floating structures that make up Lincoln Harbor Marina.  Plaintiffs have standing to assert rights of the public as Plaintiffs have been authorized pursuant to the permit issued by the NJDEP to ensure access of public to the Hudson River to use and enjoy certain water-dependent activities via Lincoln Harbor Marina.[5]  Destruction of the Lincoln Harbor Marina wave screen by excessive wakes improperly infringes on the rights of the general public.

76.     Notwithstanding such actual notice and knowledge, Defendants have increased the number of ferries operated at the Hartz Ferry Slip and in the Hartz Ferry Channel and have taken no meaningful steps to reduce the dangerous and damaging wakes produced by the ferry boats being operated to and from the Hartz Ferry Slip and in the Hartz Ferry Channel and otherwise on the Hudson River. Defendants continue to enrich themselves through negligent, reckless, and impermissible ferry operations to the detriment of Plaintiff.

77.     Upon information and belief, Defendants NY Waterway and Hartz Mountain have negligently, intentionally, purposely, willfully, maliciously and/or with gross negligence and

---

[5] *See* DEP Permit 86-0650-1, Exhibit 4, page 2 ". . . wave screen will not be limited exclusively to marina patrons and slipholders. Rather, the wavescreen will function to accommodate fishing boats, sightseeing tours and/or other access opportunities open to the general public."  There is no other public access facility of this type in Weehawken and the Lincoln Harbor Marina further serves the important function of providing a water facility which can accept disembarkation of passengers fleeing Manhattan in the event of a major emergency such as that experienced on September 11, 2001 when the wave screen pier at Lincoln harbor was used to offload approximately 50,000 people.

recklessness and with conscious disregard for the rights of others and/or with such recklessness to amount to the disregard of the rights of others operated the ferries, the Hartz Ferry Slip and the Hartz Ferry Channel in the vicinity of the Lincoln Harbor Marina in order to maximize NY Waterway's profits in the ferry business, to comply with Hartz Mountain commercial office leases and to increase property values and rents in the Lincoln Harbor PUD for the financial benefit of Hartz Mountain to the severe detriment of other stakeholders including Plaintiffs.

78.     For example, in 2004 Plaintiffs, along with eight other similarly harmed plaintiffs, filed a lawsuit against NY Waterway, its parent company, and the ferries *in rem*, relating to NY Waterway's nuisance wakes.  *Affairs Afloat, Inc., et al. v. Arcop Properties, Inc., et al.*, Case No. 04-cv-5652 (S.D.N.Y.) (NRB).  Notwithstanding the limited settlement of that case in 2007 and a narrow release of claims brought in that action, NY Waterway has engaged in new and abusive behavior and has since decided to operate the ferries in a destructive manner, causing additional, separate and continuing damages to Plaintiffs, the general public and those persons who have been limited in access to the Hudson River via the public access offered by the docks of Lincoln Harbor Marina from 2007 to present.

79.     NY Waterway has failed to take any meaningful steps to reduce its interference with LHE's use and enjoyment of LHE's property, including, failure to modify its course of navigation, modify the ferry schedule, or use ferry boats that are specifically designed to mitigate against excessive, destructive, and damaging wakes. All such changes were to be attempted pursuant to that certain Partial Settlement Agreement entered into between the parties of the 2004 action. NY Waterway continues to use the same out-of-date, defective, mono-hull ferry boats at the Hartz Ferry Slip despite NY Waterway's actual knowledge that such boats create the most harmful and damaging wakes as well as fast catamarans that cause unreasonable and excessive

wakes by design and operation in favor of greater speed.

80.     Plaintiffs LHYCCA and LHE have been, and continue to be, damaged by NY Waterway's ferry boats, including but not limited to those which call upon the Hartz Ferry Slip though the Hartz Ferry Channel, both of which have been owned, operated and controlled by Hartz Mountain at all relevant times.   On a daily basis and increasingly since inception, the NY Waterway ferries, Hartz Ferry Slip and Hartz Ferry Channel are operated carelessly, negligently and with reckless disregard to the rights of others such that ferries pass continuously on the Hudson River at excessive speeds in close proximity to the Lincoln Harbor Marina and the property of Plaintiffs LHYCCA and LHE, causing dangerous and damaging wakes as they do so.

81.     Defendants NY Waterway and Hartz Mountain have the financial ability to both mitigate the destructive NY Waterway ferry wakes and continue ferry operations at the Hartz Ferry Slip and elsewhere on the Hudson.   Despite having received and/or benefitted from state and federal funds Defendants have failed to use such public funds received for any sort of wake mitigation.

82.     As a result of the careless, negligent and otherwise improper operation of the ferry boats, Hartz Ferry Slip and Hartz Ferry Channel, Defendants NY Waterway and Hartz Mountain have at all material times caused, and now continue to cause continuous, unreasonable and damaging wakes and waves on the Hudson River and into the marina facilities of Plaintiffs LHYCCA and LHE, with the following resulting significant past and present damage and harm:

    A.     Continuous and on-going damage to the piers, docks, wave screens and other structures of said marina requiring on-going repairs to said structures in order to keep them;

    B.     Continuous and unreasonable rocking of the piers, docks, wave screens and other structures of said marina with the result that such structures have been frequently rendered unsafe and/or uninhabitable and/or unusable by Plaintiffs LHYCCA and LHE and/or their employees, guests, clients and tenants;

C.    Continuous and on-going damage to vessels moored at Plaintiffs LHYCCA and LHE's marina, including vessels owned by their guests, lessees of boat slips and owners of dock space at the marina;

D.    Continuous and unreasonable rocking of vessels moored at said Plaintiffs' marina, including vessels owned by said Plaintiffs' guests, lessees of boat slips to the extent that occupants of said vessels have been injured, alarmed and/or annoyed;

E.    Loss of business as a result of the continuous and unreasonable physical contact and damage to the piers, docks, wave screens and other structures of the marina as well as the continuous and on-going damage to vessels moored there, and the continuous and unreasonable rocking of vessels as a result of the waves and wakes, including the loss of lessees of boat slips at the marina due to the physical, unrelenting impact of unreasonable wakes created by Defendants' operation of the ferries;

F.    Diminution in the value of the real property owned by Plaintiffs, specifically diminution in the value of the boat slips owned in fee simple by Plaintiff LHE as a result of the physical contact and damage thereto caused by unrelenting impact of the unreasonable wakes created by Defendants' operation of the ferries, the Hartz Ferry Slip and the Hartz Ferry Channel;

G.    Otherwise unnecessary expenditures by Plaintiffs on items, devices, structures and labor costs required to attempt to minimize the impact of the dangerous and damaging wakes created by Defendants' operation of the ferries, the Hartz Ferry Slip and the Hartz Ferry Channel so as to maintain Plaintiffs' piers, docks, wave screens and other structures and maintain remaining business and tenants at the marina;

H.    The complete and total destruction of Lincoln Harbor Marina including extreme damage to floating pier pontoons causing the pontoons to sink, submersion of electrical and water service piping rendering these items inoperable and unusable which has resulted in the need for a total replacement of all piers, supporting pontoons, electrical grid and water piping for which Plaintiffs have made the initial preparations of clearing out the damaged piers, pontoons and service lines and equipment.

I.    The requirement that Plaintiffs discover, design, engineer, construct, install, implement and provide the substantial cost of presently unknown or untried effective mitigation barriers, including effective wave screens or other effective attenuating screens or barriers, in an attempt to mitigate the damage and destruction caused by Defendants to and within Lincoln Harbor Marina.

**PLAINTIFFS' CAUSES OF ACTION**

**COUNT ONE**

**(Maritime Tort and State Tort Claims and Claims for Violation of Federal and State Statutes against Defendant Hartz Mountain)**

83.     Plaintiffs repeat, reallege and restate paragraphs 1 through 82 as though fully set forth herein.

84.     Defendant Hartz Mountain has used and operated, and continues to use and operate, the Hartz Ferry Slip in a careless and negligent manner, permitting ferry operations by Defendant NY Waterway at the Hartz Ferry Slip far beyond the scope authorized by the 1988 ACE Ferry Landing Permit and applicable law and statute, without due care and in reckless disregard to the rights of others, including Plaintiffs.

85.     Defendant Hartz Mountain has permitted, and continues to permit, Defendant NY Waterway to operate Defendant NY Waterway's ferries in the Hartz Ferry Channel in a careless and negligent manner, far beyond the scope authorized by the 1988 ACE Ferry Landing Permit and applicable maritime rules and laws, without due care and in reckless disregard to the rights of others, including Plaintiffs.

86.     Defendant Hartz Mountain, in order to enrich itself through increased property values and rental income in Lincoln Harbor PUD, has coordinated with NY Waterway in the Hartz Ferry Contract and otherwise to increase the number of ferries calling at Lincoln Harbor in order to service large tenants such as UBS who pay greater rents in exchange for expansive ferry operations and to force said ferries to adhere to a schedule (and therefore, speed) which causes unreasonable, excessive, damaging and destructive wakes.

87.     Defendant Hartz Mountain has knowingly, intentionally and continually allowed

and contracted with Defendant NY Waterway to operate its ferry boats calling at the Hartz Ferry Slip in a manner that has created unreasonable wakes, waves and swells at all times applicable to this lawsuit, with resulting damage to Plaintiffs.

88.    By allowing and contracting to permit Defendant NY Waterway to operate its ferry boats at the Hartz Ferry Slip and in the Hartz Ferry Channel so as to cause dangerous and damaging wakes causing substantial damage to Plaintiffs and Plaintiffs' property, Defendant Hartz Mountain has acted willfully, wantonly, recklessly, with malice and with conscious disregard to the rights of others, including Plaintiffs.

89.    Hartz Mountain and NY Waterway are part of a common enterprise and are jointly and severally liable for damages caused by the operations of such enterprise.

90.    Defendant Hartz Mountain has acted so as to maximize its profits from its ownership and operation of properties in the Lincoln Harbor PUD and to increase the value of its real property owned and managed by it and its affiliates and tenants in the Lincoln Harbor PUD.

91.    Defendant Hartz Mountain has caused direct damage to Plaintiffs and Plaintiffs' property by allowing and contracting to permit Defendant NY Waterway to operate its ferries in an unsafe, unreasonable and negligent manner in violation of various maritime rules and laws, including, but not limited to, 46 U.S.C. §2302, 46 C.F.R. §185.304, 33 C.F.R. § 164.11 and NJ Rev State § 12:7-47 (2014).

92.    Defendant Hartz Mountain has caused Plaintiffs to expend sums of money to protect, repair and replace Plaintiff's property, including labor and materials that would not have otherwise been necessary but for the damaging and destructive ferry wakes that Defendant Hartz Mountain has knowingly and intentionally allowed and contracted to permit Defendant NY Waterway to cause.

93.   Plaintiffs' continued expenses caused by Defendant Hartz Mountain as aforesaid are so substantial that, together with the lost income incurred as a result of the destruction caused by the ferry wakes, they make the profitable operation of the Lincoln Harbor Marina impossible under the current wake conditions.

94.   Sums expended by Plaintiffs as a result of the dangerous and destructive wakes permitted by and resulting from Defendant Hartz Mountain's acts would not have been expended by Plaintiffs but for the carelessness and negligence, gross negligence and recklessness of Defendant Hartz Mountain in permitting and contracting for Defendant NY Waterway's ferry operations and the unpermitted, unauthorized and illegal extent of the ferry landings at the private Hartz Ferry Slip owned by Hartz Mountain and the negligent and reckless ferry transits in the private Hartz Ferry Channel owned by Hartz Mountain.

95.   Plaintiffs have been expending, and will be, required to expend additional sums to construct the substantial structures necessary to protect Plaintiffs' property from dangerous and destructive wakes caused by Defendant Hartz Mountain's negligent, tortious, unlawful and otherwise improper actions with respect to the operations of the ferry boats at the Hartz Ferry Slip and in the Hartz Ferry Channel.

96.   In addition, as a direct result of Defendant Hartz Mountain's negligent, tortious, unlawful and otherwise improper actions with respect to the operations of the ferry boats, the Hartz Ferry Slip and the Hartz Ferry Channel so as to cause dangerous and destructive wakes and resulting physical impact and damage to vessels, docks, piers, structures and equipment of Plaintiffs, Plaintiffs have suffered lost earnings and income and diminution of value of property owned by Plaintiffs.

97.   As a direct result of Defendant Hartz Mountain's negligent, tortious, unlawful and

otherwise improper actions, both severally and jointly with Defendant NY Waterways, with respect to the operations of the ferry boats, the Hartz Ferry Slip and the Hartz Ferry Channel so as to cause and permit dangerous and destructive wakes and resulting physical impact upon Plaintiffs' property, Plaintiffs LHYCCA and LHE have suffered, without limitation, the specific damages recited hereinabove.

98.     Hartz Mountain owes a duty to Plaintiffs.  Federal maritime law and New Jersey common law require Hartz Mountain to act in a lawful, non-negligent and non-reckless manner and based on the allegations set forth hereinabove Hartz Mountain is liable to Plaintiffs' for damages for physical harm and economic loss under both Federal Maritime law and New Jersey common law.

99.     As a direct result of Defendant Hartz Mountain's actions as aforesaid, Plaintiffs LHYCCA and LHE have suffered actual damages in the approximate amount of $10 million and continue to suffer damages on an on-going basis.  All of such damages have accrued during the six-year limitations period provided by NJ Rev. Stat § 2A:14-1 (2013).

100.     As a direct result of Defendant Hartz Mountain's actions as aforesaid, Plaintiffs LHYCCA and LHE will suffer reasonably foreseeable future damages anticipated to exceed $15 million, an amount which will include the cost to discover, design, engineer, construct, install and implement presently unknown or untried effective wake abatement systems.

101.     As a result of their willful, wanton and malicious conduct of Defendant Hartz Mountain as aforesaid, Defendant Hartz Mountain is liable to Plaintiffs for punitive damages.

102.     Defendant Hartz Mountain has, by and through the conduct and actions as set forth hereinabove and its unauthorized use and operation of the Hartz Ferry Slip as a self-serving transit hub and the resultant damage to the property interests of its neighbors including Plaintiffs and the

environment violates the Waterfront Development Act, N.J.S.A. 12:5-1 *et seq.*, the Coastal Zone Management Rules, N.J.A.C. 7:7-1.1 *et seq.*, the Coastal Zone Management Act of 1972, 16 U.S.C. §§1451-1464, and the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. Sections 401-476, *et seq.* and general maritime law.  The violation of Section 403 of the Rivers and Harbors Act of 1899 is directly related to the maritime tort claims by Plaintiffs against Defendants for wakes generated by the NY Waterway ferries which harm the environment using the Hartz Ferry Channel and Hartz Ferry Slip and Plaintiffs have standing to allege violations pursuant to N.J.S.A. 2A:35A-4(a).

103.    This Court has jurisdiction over Plaintiffs' claims against Defendants under New Jersey State law, including environmental law and any claims that Plaintiffs might otherwise assert pursuant to the Environmental Rights Act, N.J.S.A. 2A:35A-1 *et seq.*  Under the Environmental Rights Act, any person may maintain an action for declaratory and equitable relief against any other person for the protection of the environment, or the interest of the public therein, from pollution, impairment or destruction. N.J.S.A. § 2A:35A-4.[6]

## COUNT TWO

### (Maritime Tort and State Law Tort Claims and Claims for Violations of Federal and State Statutes against Defendant NY Waterway)

104.    Plaintiffs repeat, reallege and restate paragraphs 1 through 103 as though fully set forth herein.

105.    Defendant NY Waterway has operated, and continues to operate, its ferry boats

---

[6] Prior to the filing of this action Plaintiffs initiated an action against defendant Hartz Mountain in the Superior Court of New Jersey, Hudson County, Docket No. HUD-L-1716-18 ("State Court Action"), concerning a parking dispute. Defendant Hartz Mountain asserted counterclaims for breach of the Master Deed, breach of the parking easement and for alleged violations of various State and Federal Statutes due to the location of a work barge in Plaintiffs marina. Plaintiffs' claims in this action have not and will not be litigated in the State Court Action.

carelessly, negligently, without due care and with reckless disregard to the rights of others, including Plaintiffs.

106.    Defendant NY Waterway, although required to operate its ferry boats in a manner to avoid creating unreasonable wakes, waves and swells, at all times applicable to this law suit, failed to do so with resulting damage to Plaintiffs.

107.    Defendant NY Waterway, as a ferry boat operator, is obligated to pass docks, piers, marinas and vessels at a rate of speed and/or at a distance so that no danger or damage will result from the wakes of its ferry boats.  Defendant NY Waterway continually and routinely fails to meet such requirements and continually and routinely breaches such obligations.

108.    Defendant NY Waterway, in operating its ferry boats so as to cause dangerous and damaging wakes causing substantial damage to the vessels, docks, piers, and other property of others has acted willfully, wantonly, recklessly, with malice and with conscious disregard to the rights of others, including Plaintiffs.  Upon information and belief, Defendant NY Waterway has so acted so as to maximize its income and profits from its ferry service and to increase the value of its ferry business and associated properties and businesses.

109.    NY Waterway knew, or should have known, it was operating its ferries in the Hartz Ferry Channel and to and from the Hartz Ferry Slip in a number, frequency and speed which far exceeded that permissible under the 1988 ACE Ferry Landing Permit.

110.    NY Waterway and Hartz Mountain are part of a common enterprise and are jointly and severally liable for damages caused by the ferry operations beyond the scope of the 1988 ACE Ferry Landing Permit.

111.    By operating its vessels in an unsafe, unreasonable and negligent manner, Defendant NY Waterway operated said ferries in violation of various maritime rules and laws,

including, but not limited to 46 C.F.R. 185.304, 33 C.F.R. § 164.11 and NJ Rev State § 12:7-47 (2014), such violations of such rules and laws having caused damage to Plaintiffs.

112.    Defendant NY Waterway has operated and continues to operate its ferry boats carelessly, negligently, without due care and with reckless disregard to the rights of others, including Plaintiffs, so as to have and continue to cause dangerous and destructive wakes that have damaged the vessels, docks, piers, dock structures, wave screens and other infrastructure and equipment of Plaintiffs (collectively, without limitation, "Plaintiffs' property") and have caused Plaintiffs to expend sums of money to protect, repair and replace such damaged property, including labor and materials that would not have otherwise been necessary but for the damaging wakes.

113.    Plaintiffs' continued expenses caused by Defendant NY Waterway as aforesaid are so substantial that, together with the lost income incurred as a result of the destruction caused by the ferry wakes, they make the profitable operation of the Lincoln Harbor Marina impossible under the current wake conditions

114.    Sums expended by Plaintiffs as a result of the dangerous and destructive wakes created by Defendant NY Waterway's acts would not have been expended by Plaintiffs but for the carelessness and negligence, gross negligence and recklessness of Defendant NY Waterway in operating its ferry boats.

115.    Plaintiffs have, and will be, required to expend sums to construct the substantial structures necessary to protect Plaintiffs' property from dangerous and destructive wakes caused by Defendant NY Waterway's negligent and otherwise improper operation of its ferry boats.

116.    In addition, Plaintiffs have suffered lost earnings and income and diminution of value of property owned by Plaintiffs as a direct result of Defendant NY Waterway's negligent and otherwise improper operation of its ferry boats so as to cause dangerous and destructive wakes

and resulting physical impact and damage to Plaintiffs' property.

117.     As a direct result of Defendant NY Waterway's negligent and otherwise improper operation of its ferry boats so as to cause dangerous and destructive wakes and resulting physical impact upon Plaintiffs' property, Plaintiffs LHYCCA and LHE have suffered, without limitation, the specific damages recited hereinabove.

118.     As a direct result of Defendant NY Waterway's actions as aforesaid, Plaintiffs LHYCCA and LHE have suffered actual damages in the approximate amount of $10 million and continue to suffer damages on and on-going basis.  All of such damages have accrued during the six-year limitations period provided by NJ Rev Stat § 2A:14-1 (2013).

119.     Defendant NY Waterway has, by and through the conduct and actions as set forth hereinabove and its unauthorized use and operation of the Hartz Ferry Slip as a self-serving transit hub and the resultant damage to the property interests of its neighbors and the environment violates the Waterfront Development Act, N.J.S.A. 12:5-1 *et seq.*, the Coastal Zone Management Rules, N.J.A.C. 7:7-1.1 *et seq.*, the Coastal Zone Management Act of 1972, 16 U.S. C. §§1451-1464, and the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. Sections 401-476, *et seq.* and general maritime law.  The violation of Section 403 of the Rivers and Harbors Act of 1899 is directly related to the maritime tort claims by Plaintiffs against Defendants for wakes generated by the NY Waterway ferries which harm the environment using the Hartz Ferry Channel and Hartz Ferry Slip and Plaintiffs have standing to allege violations pursuant to N.J.S.A. 2A:35A-4(a).

120.     This Court has jurisdiction over Plaintiffs' claims against Defendants under New Jersey State law, including environmental law and any claims that Plaintiffs might otherwise assert pursuant to the Environmental Rights Act, N.J.S.A. 2A:35A-1 *et seq.*  Under the Environmental Rights Act, any person may maintain an action for declaratory and equitable relief against any

other person for the protection of the environment, or the interest of the public therein, from pollution, impairment or destruction. N.J.S.A. § 2A:35A-4.[7]

121.    As a direct result of Defendant NY Waterway's actions as aforesaid, Plaintiffs LHYCCA and LHE will suffer reasonably foreseeable future damages anticipated to exceed $15 million, an amount which will include the cost to discover, design, engineer, construct, install and implement presently unknown or untried effective wake abatement systems.

122.    NY Waterway owes a duty to Plaintiffs.  Federal Maritime law and New Jersey common law require NY Waterway to act in a lawful, non-negligent and non-reckless manner and based on the allegations set forth hereinabove NY Waterway is liable to Plaintiffs' for damages for physical harm and economic loss under both Federal Maritime law and New Jersey common law.

123.    As a result of their willful, wanton and malicious conduct in operating its ferry boats, Defendant NY Waterway is liable to Plaintiffs for punitive damages.

## COUNT THREE

### (Nuisance)

124.    Plaintiffs repeat, reallege and restate paragraphs 1 through 123 as though fully set forth herein.

125.    By their actions in continuously creating unreasonable, dangerous and destructive wakes by the operation of the ferry boats and ferry landing on the Hudson River Defendants have caused and if not abated will continue to cause irreparable harm to Plaintiffs and Plaintiffs'

---

[7] Plaintiff through the allegations set forth herein both against Hartz Mountain and NY Waterway have alleged and shown immediate and irreparable harm will result from the actions of Defendants and, as such, no prior notice is required under the Environmental Rights Act.  Nonetheless, Plaintiffs have given express notice via letter of Plaintiffs intention to file suit to defendant Hartz Mountain and NY Waterway and the federal and state agencies with authority and oversight over the laws and regulations being violated by Defendants including, but not limited to, the Attorney General of the State of New Jersey, and more than 30 days have passed since formal notice was provided.

property as set forth herein, with no adequate remedy at law.   Plaintiffs invoke the Court's equitable authority to grant the permanent injunctive relief requested herein, and for monetary damages as a result of the public and private nuisance caused by Defendants against Plaintiffs.

126.   Plaintiffs have made numerous applications and complaints to Defendants in an effort to have Defendants abate the dangerous and destructive wakes caused by Defendant NY Waterway's ferry boats operating on the Hudson River, specifically in and around Lincoln Harbor, from and to the Hartz Ferry Slip and in the Hartz Ferry Channel as contracted and permitted by Defendant Hartz Mountain.   Defendants have refused to make any meaningful efforts to abate the dangerous and destructive wakes caused by the ferry boats and, instead, have routinely attempted to blame Plaintiffs and other victims of the dangerous and destructive ferry wakes for the damage caused by said wakes.

127.   Defendants had and continue to have an obligation to operate the ferry boats, the Hartz Ferry Slip and the Hartz Ferry Channel in a reasonable manner so as to not create unreasonable wakes that cause danger to individuals and/or commercial interests using the Hudson River and/or damage to vessels, docks, piers, wave screens and other marine infrastructure and equipment.

128.   Hartz, as owner of the Hartz Ferry Channel and Hartz Ferry Slip, owes Plaintiffs a duty to not unreasonably interfere with the use and enjoyment of the Lincoln Harbor Marina property.

129.   Defendants have caused direct damage to the public and to Plaintiffs and Plaintiffs' property by operating the ferries, and by allowing and contracting to permit the operation of the ferries, in an unsafe, unreasonable and negligent manner in violation of various maritime rules and laws, including, but not limited to 46 C.F.R. 185.304, 33 C.F.R. § 164.11 and NJ Rev State § 12:7-

47 (2014).

130.   Plaintiffs have relied and will continue to rely upon the use of docks, piers and structures located on the Hudson River in the vicinity of Lincoln Harbor for their respective operations and commercial livelihoods.  The business and property of the Plaintiffs have been and are continuously and adversely directly impacted on a daily basis by Defendant NY Waterway's ferries being operated on the Hudson River, and by Defendant Hartz Mountain permitting and contracting for their operation, including in the Hartz Ferry Channel and at the Hartz Ferry Slip beyond the scope of the original ACE (and since then the only) permit for the Hartz Ferry Slip.

131.   Defendants have the financial ability to mitigate the wakes generated by the ferry operations into and out of the Hartz Ferry Slip without impacting Defendants' ability to continue to operate and/or benefit from the Hartz Ferry Slip.

132.   Plaintiff LHE's property and economic interests are directly impacted by the dangerous and damaging wakes created by the operation of the ferries as aforesaid in that LHE owns boat slip units in fee simple on the Hudson River, and related docks, piers and structures, that are directly adversely impacted by the wakes.  Plaintiff LHYCCA similarly has a property interest directly impacted by the dangerous and damaging wakes created by the operation of the ferries as it manages and is obligated to maintain and repair a marina, common infrastructure elements and boat slips that are continually physically battered by the dangerous and damaging wakes of the ferries, as a result of Defendant NY Waterway's negligent, tortious, unlawful and otherwise improper ferry operations and Defendant Hartz Mountain's negligent, tortious, unlawful and otherwise improper actions with respect to the operations of the ferry boats to and from the Hartz Ferry Slip and in the Hartz Ferry Channel.

133.   As a result of Plaintiffs' property interests in waterfront property on the Hudson

River and Plaintiffs' businesses at those locations which have been and continue to be directly adversely impacted by the dangerous and damaging ferry wakes, as well as their reliance for their economic existence upon the waters of New York Harbor and the Hudson River operating established businesses that make commercial use of said waterways with which Defendants interfere, the Plaintiffs have suffered damage, pecuniary and otherwise, of a special character, distinct and different than injury caused by such ferry wakes to the public at large.

134.    Defendants' actions in creating dangerous and damaging wakes by operation of the ferry boats and operation of the Hartz Ferry Slip outside the scope of the original ACE Ferry Landing Permit have adversely affected the manner and extent to which the public, including commercial vessel operators, marina owners, owners and lessees of property on the Hudson River, such as Plaintiffs, and recreational users, utilize the Hudson River.

135.    Defendants' actions in creating, permitting and contractually authorizing dangerous and damaging wakes by the operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel have caused and continue to cause danger to individuals recreating and/or working on vessels, docks, piers, wharfs and marinas in New York Harbor and specifically on the Hudson River.  Specifically, as a result of the dangerous and damaging wakes of Defendant NY Waterway's ferry boats, there have been limited times in which recreational users of boats (such as those located in the Lincoln Harbor Marina) can be boarded, disembarked or enjoyed, because the wakes cause so much unreasonable movement as to render the recreational boats unsafe to walk on, to or from, at various times during the day.  Upon information and belief, the dangerous and damaging wakes of the NY Waterway ferries have caused personal injuries to individuals attempting to utilize the Hudson River for recreational use.

136.    Defendants' actions in creating, permitting and contractually authorizing dangerous

and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel have caused individuals and commercial interests to limit their recreational and commercial use of the Hudson River and have also caused individuals and commercial interests to alter the times and manner in which they engage in recreational and/or commercial use of the Hudson River.

137.    Defendants' actions in creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel have caused, and if unabated will continue to cause individuals and commercial interests increased costs in operating vessels and/or conducting commercial business on the Hudson River.

138.    Defendants' actions in creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel have adversely affected, and if unabated will continue to adversely affect the enjoyment of the Hudson River by individuals engaged in recreational use of the river.

139.    Defendants' actions in creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel in a manner that continuously and repeatedly has caused, and continues to cause, dangerous and damaging wakes has substantially interfered with, and continues to substantially interfere with, the rights of Plaintiffs and others to utilize the Hudson River.

140.    Defendants' conduct, which constitutes both a public and private nuisance, if unabated, will continue in the creation, permitting and contractually authorizing of dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel with the result that individuals and commercial entities' use and enjoyment of the

Hudson River will be negatively diminished, altered and changed.

141.    Defendants' conduct, which constitutes both a public and private a nuisance, if unabated, will continue in the creation, permitting and contractually authorizing of dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel with the result that individuals and commercial entities will suffer increased costs in utilizing, conducting business and/or enjoying the Hudson River.

142.    Defendants' conduct complained of herein has occurred during the six-year limitations period provided by N.J.S.A. 2A:14-1 (2013) and was and continues to be unreasonable under the circumstances.

143.    Further, Defendants' conduct complained of herein has caused, and if unabated, will continue to cause irreparable harm as outlined above, without any adequate remedy at law.

**COUNT FOUR**

**(Equitable Relief Under N.J.S.A. 2A-35A-6)**

144.    Plaintiffs repeat, reallege and restate paragraphs 1 through 143 as though fully set forth herein.

145.    In passing the Environmental Rights Acts Act, N.J.S.A. 2A:35A1-13, the New Jersey Legislature determined that New Jersey's environment is continually threatened by pollution, impairment and destruction and that every person has a substantial interest in minimizing this condition, and that it is therefore in the public interest to enable ready access to the courts for the remedy of such abuses. N.J.S.A. 2A:35A-2.

146.    Under the Environmental Rights Act, pollution, impairment or destruction of the environment means any actual pollution, impairment or destruction to any natural resources of the State and shall include, but not be limited to, air pollution, water pollution excessive noise,

impairment of rivers or other water resources, destruction of open spaces, natural areas, parks or historic areas.  See generally, N.J.S.A. 2A:35A-3(b).

147.    Pursuant to the citizen suit provision of N.J.S.A. 2A:35A-4, "any person may commence a civil action in a court of competent jurisdiction against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment," and the plaintiff alleges "that a person is in violation, either continuously or intermittently, of a statute, regulation or ordinance, and that there is a likelihood that the violation will recur in the future."

148.    Defendants Hartz Mountain and NY Waterway as set forth in detail hereinabove, have acted and continue to act in ways damaging to the environment and property in violation of several New Jersey and federal statutes and regulations designed to protect the environment and avoid damage to property including, but not limited to (i) the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. Sections 401-476, et seq., and the provisions of 46 C.F.R. 185.304, 33 C.F.R. § 164.11, and the Coastal Zone Management Act of 1972, 16 U.S. C. §§1451-1464, applicable thereto; (ii) the Waterfront Development Act, N.J.S.A. 12:5-1 et seq., the Coastal Zone Management Rules, N.J.A.C. 7:7-1.1 et seq., and NJ Rev State § 12:7-47 (2014); and (iii) general maritime law.

**NY Waterway and Hartz Mountain Knowingly Have Been Violating and Continue to Violate the 1988 ACE Ferry Landing Permit, the Rivers and Harbors Act and the Waterfront Development Act**

149.    Pursuant to the Environmental Rights Act Plaintiffs have standing to assert violations of the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. Sections 401-476, *et seq.*, the Coastal Zone Management Act of 1972, 16 U.S. C. §§1451-1464, and the Waterfront Development Act, N.J.S.A. 12:5-1 *et seq.*,  which are statutes designed in relevant part to prevent or minimize pollution, impairment or destruction of the environment. Under the Coastal Zone

Management Act of 1972, 16 U.S. C. §§1451-1464 the ACE, in considering any permit to be issued for a New Jersey located private ferry landing, must obtain a coastal zone consistency determination from the NJDEP that such ferry landing and the operations associated therefrom would comply with New Jersey's Waterfront Development Act and Coastal Zone Management Rules, N.J.A.C. 7:7-1.1 *et seq.*, and prevent or minimize any adverse environmental impact. Under the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. Sections 401-476, *et seq.* the Army Corps also must consider applicable Federal provisions designed to prevent or minimize any adverse environmental impact during its statutorily required public interest analysis.[8] Under 33 CFR Part 320.4(a), the ACE must weigh heavily a project's probable adverse environmental impacts when determining if a project, based on the facts presented, is in the public interest and should be approved.

150. Likewise pursuant to the Environmental Rights Act, based on the allegations set forth herein of NY Waterway's and Hartz Mountain's gross violations of the 1988 ACE Ferry Landing Permit for the Hartz Ferry Slip and authorizing federal and state statutes, Plaintiffs have standing to seek relief directly from this Court in the form of immediate restrictions on NY Waterway and Hartz Mountain to mitigate the adverse wakes which cause them to violate the 1988 ACE Ferry Landing Permit.

151. Under 33 CFR Part 325.1.d.1, the ACE requires the applicant to provide a complete description of the proposed project and the ACE relies on such applicant description when

---

[8] Permit evaluations and permits as issued for other NY Waterway sites have expressly noted the applicable statutory authorities that apply and must be complied with before a ferry terminal permit is issued by ACE. The statutory authorities include, Section 10 of the Rivers and Harbors Act of 1899 (30 Stat. 1151; 33 U.S.C. 403); Section 404 of the Clean Water Act (PL 92-500, 86 Stat. 816; 33 U.S.C. 1344); Section 307c of the Coastal Zone Management Act of 1972, as amended (16 U.S.C. 1456 (c)); Section 106 of the National Historic Preservation Act (NHPA) of 1966 (16 U.S.C. 470); Section 7 of the Endangered Species Act (ESA) (16 U.S.C. 1531 et seq.); The National Environmental Policy Act of 1969 (42 U.S.C. 4321-4347); The Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act of 1996 (Public Law 104-267); Fish and Wildlife Coordination Act (48 Stat 401 as amended; 16 U.S.C. 661 et seq.); Migratory Bird Treaty Act (40 Stat 755 as amended; 16 U.S.C. 703-712).

conducting its public interest analysis. False, misleading or incomplete applicant descriptions deprive the ACE of its ability to appropriately consider potential adverse environmental impacts and appropriately obtain a coastal consistency determination as required by the Coastal Zone Management Act.  Similarly, a change of circumstances or facts regarding a project disrupts the public interest analysis and coastal consistency determinations and deprives the public interest of the protections afforded by this environmental protection regime. Hartz Mountain, NY Waterway and ACE have been expressly notified that the operations at the Hartz Ferry Slip and in the Hartz Ferry Channel far exceed the project description and operational conditions presented by Hartz Mountain at the time ACE issued the 1998 ACE Ferry Landing Permit.  ACE in 1988, when only two ferries a day were in service with no further expansion expressly considered stated that  "no detrimental effects are expected to occur" and that the "subject application has been evaluated in light of the probable impact including cumulative impacts of the proposed activity and its intended use upon the public interest." Ex.1 at 13. Undeniably, the facts have changed and the public interest is threatened.

152.    The current NY Waterway ferry operations at the Hartz Ferry Slip are not consistent with the information provided by Hartz Mountain in its original permit application.  NY Waterway and Hartz Mountain knowingly violate the 1988 ACE Ferry Landing Permit each and every day and have been intentionally doing so for many years by operating the Hartz Ferry Slip with a greater number of ferries on a more frequent schedule than originally contemplated.  Despite knowledge that the facts as stated in the application are grossly different from the current scope of ferry operations and despite knowledge of the wide ranging environmental harms associated with large-scale ferry operations, ACE has declined Plaintiffs' request to take specific action to revoke or modify the 1988 ACE Ferry Landing Permit or otherwise impose conditions over NY Waterway

and Hartz Mountain with respect to the 1988 ACE Ferry Landing Permit.

153.    Under 33 CFR §325.7, the ACE may re-evaluate the circumstances and conditions of any permit and may initiate action to modify, suspend, or revoke a permit as may be necessary by considerations of public interest. "Among the factors to be considered are the extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the authorized activity have changed since permit was issued…" 33 CFR §325.7 The increased scope of ferry trips in and around the vicinity of the Lincoln Harbor Marina, in the Hartz Ferry Channel and at the Hartz Ferry Slip is clearly an increase in the scope of permitted activity and a dramatic change of circumstances that were simply not contemplated when the ACE first conducted its public interest analysis in 1988. The Rivers and Harbors Act, the Coastal Zone Management Act and the public interest, demand that the ACE re-evaluate the facts as they exist today at the Hartz Ferry Slip. A  new application for the Hartz Ferry Slip should be submitted and processed anew in accordance with 33 CFR § 325.2 including a new environmental assessment, evaluation and approval by the NJDEP, pursuant to the Waterfront Development Act and Coastal Zone Regulations, and full public hearings.

154.    The Hartz Ferry Slip operations are so far beyond the scope of the original authorizations such that the current operations should be considered un-authorized. As the River and Harbors Act requires prior authorization, including a complete and accurate public interest analysis, Defendants are operating the Hartz Ferry Slip in violation of the Rivers and Harbors Act and, in order to protect the environment from the known environmental harms of large scale ferry operations, must be compelled to comply with the permit requirements of the Rivers and Harbors Act.

155.    Upon information and belief, Defendants do not have a valid authorization under

the Waterfront Development Act and the Coastal Zone Management Rules. Such authorization is required for the Hartz Ferry Slip without which the Defendants are operating the Hartz Ferry Slip in violation of New Jersey law.

156.    Over thirty (30) days ago Plaintiffs gave defendants NY Waterway and Hartz Mountain the requisite Notice of Intent to Commence Action in accordance with N.J.S.A. 2A:35A-11 by mailing, via certified mail the letters annexed hereto as Exhibits 8 and 9 and have provided sufficient notice to the government agencies charged with oversight and enforcement of the alleged violations of various State and Federal laws designed to protect the environment.

157.    Defendants Hartz Mountain and NY Waterway have not agreed to cease the unlawful operations identified nor have they remedied such offending conduct.   Despite knowledge of the significant and continuing harm caused by NY Waterway ferry wakes to the environment and property in and around the Hartz Ferry Slip and in the Hartz Ferry Channel, and the Hudson River in general, no State or federal agency has assumed a leadership role in enforcing the numerous New Jersey and federal statutes and regulations (including no wake zones) that prohibit the destructive wakes caused by the NY Waterway ferries in the vicinity of the Lincoln Harbor Marina and at Hartz Ferry Slip and in the Hartz Ferry Channel.   ACE has declined to take any steps whatsoever to address the harm to the environment and property caused by NY Waterway and Hartz Mountain's operations at the Hartz Ferry Slip.

158.    Plaintiffs seek equitable relief under N.J.S.A. 2A:35A-6 ordering NY Waterway to cease and desist all operations in and around the Lincoln Harbor Marina and Hartz Ferry Slip and in the Hartz Ferry Channel beyond the scope allowable by State and federal laws and allowable under the 1988 ACE Ferry Landing Permit.

159.    Plaintiffs seek equitable relief under N.J.S.A. 2A:35A-6 ordering NY Waterway

and Hartz Mountain to cease and desist all operations at Hartz Ferry Slip and in the Hartz Ferry Channel that exceed the scope of the original ACE Ferry Landing Permit until such time as NY Waterway and Hartz Mountain provide compensation to Plaintiffs for the environmental and property damage caused by Defendants and until such time as a current environmental assessment and impact analysis can be performed as required under New Jersey and Federal laws.

160.    Pursuant to N.J.S.A. 2A:35A-7 no conduct shall be authorized or approved which does, or is likely to impair or cause harm to the environment and property of the public interest therein so long as there is feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare.  The negligent, willful and reckless acts of NY Waterway and Hartz Mountain in the operation of NY Waterway ferries and Hartz Ferry Slip in violation of numerous State and federal statutes and regulations is particularly egregious as there are feasible and prudent alternatives that would not cause wakes damaging to the environment and property in and around Lincoln Harbor Marina.   Contrary to N.J.S.A. 2A:35A-7 NY Waterway and Hartz Mountain failed to utilize ferries, construct mitigation systems, and implement a schedule that would avoid destruction and impairment of the environment and property.  It is well documented, via a number of public studies on the NY Waterway ferry wakes, that the need for convenient waterborne transportation services to Hartz Mountain tenants, private individuals and even the public at large can be reasonably balanced with the damaging effect of wakes by implementing a host of rules, mitigation systems, operational limitations and ferry designs. However, NY Waterway and Hartz Mountain have failed to take such action.

**ACE Must Order an Environmental Impact Statement for the Hartz Ferry Slip and the Entire Hudson River NY Waterway Ferry System**

161.    The known environmental harm and property damage caused by NY Waterway ferry wakes and the increased ferry traffic at the Hartz Ferry Slip requires that ACE take remedial

action which ACE has failed to take in response to Plaintiffs' ERA notice and prior requests.

162.     Under the National Environmental Policy Act, 42 U.S.C. §4321 to 4347, §4332(c) lead agencies, like ACE in the coastal zone, must supplement the initial Environmental Impact Statement (EIS) or Environmental Assessment (EA) if there are significant new circumstances or information relevant to environmental concerns. When presented with the overwhelming data, beginning in the early 2000's, demonstrating that NY Waterway ferry wakes cause significant damage to the environment including property, ACE was required to perform at least an environmental assessment of the Hartz Ferry Slip permit.[9]

163.     At this point the negative effects on property and the environment caused by wake damage from NY Waterway ferries is so widely known and of such significance that ACE could not issue a finding of no significant impact. Hartz Mountain, in addition to all permit holders in the NY Waterway ferry system, should be required to submit a full environmental impact statement in order to allow ACE to reevaluate the cumulative environmental impact of the 1988 ACE Ferry Landing Permit along with all other ferry terminals in the NY Waterway Hudson River network. 40 C.F.R. §§1501-1508.

164.     The excessive and damaging wakes from NY Waterway ferries have been widely studied and well-documented and the general consensus is that significant restrictions on the speed and operation of the NY Waterway ferries need to be implemented and strictly enforced to avoid continued environmental and property damage along various portions of the Hudson River including in and around Lincoln Harbor Marina.  The use and operation of ferries at the Hartz Ferry Slip and in the Hartz Ferry Channel by Hartz Mountain and NY Waterway has caused

---

[9] The 1988 ACE Ferry Landing Permit expressly contemplates reevaluation of the permit decision at any time circumstances warrant.  Significant new information which surfaces that was not considered in reaching ACE's initial decision is a circumstance that should require a reevaluation.  Pending such a determination, suspension of the  of the 1988 ACE Ferry Landing Permit is appropriate under the circumstances present here under 33 CFR § 325.7.

millions of dollars in damages to property and the environment and such operation has far exceeded the scope of the original permit and would not pass an environmental assessment required under New Jersey and federal laws.  ACE has expressly required that various forms of wake mitigation be implemented by NY Waterway prior to issuance of ferry landing approvals including but not limited to zero wake restrictions and GPS location monitoring at other NY ferry terminals used by NY Waterway but ACE has ignored Plaintiffs' request to address the excessive wake problem at the Hartz Ferry Slip, in the Hartz Ferry Channel by Hartz and in the vicinity of Lincoln Harbor Marina.

165.    Plaintiffs further seek all other equitable relief available under N.J.S.A. 2A:35A-6 including but not limited to the relief set forth herein below each of which is necessary to protect the environment from impairment or destruction, and the interest of the public therein.

166.    Pursuant to N.J.S.A. 2A:35A-10, Plaintiffs seek and award of the costs of this litigation including, but not limited to, reasonable attorneys' fees and expert witness fees.

## AS TO ALL COUNTS

### (Damages)

167.    Wherefore, Plaintiffs seek equitable relief including but not limited to the following:

A)    An order that Defendant NY Waterway operate its ferries, individually and cumulatively, on the Hudson River without wakes in the vicinity of Plaintiffs' piers, docks, marinas and vessels on the Hudson River, including Lincoln Harbor Marina;

B)    An order requiring Defendant NY Waterway to design routes for its ferries operating on the Hudson River that minimize to the fullest extent possible the effects of the damaging waves and wakes created by its ferry boats upon Plaintiffs' piers, docks, marinas and vessels on the Hudson River, including Lincoln Harbor Marina;

C)    An order requiring Defendant NY Waterway to install navigational equipment upon its ferry boats to insure that its ferry boat operators at all times operate the ferry

boats within the confines of routes designed to minimize the impact of its ferry boats upon piers, docks, marinas and vessels on the Hudson River, including Lincoln Harbor Marina;

D)      An order that Defendant NY Waterway log, track and otherwise record the routes and speeds of its ferry boats and permanently keep and maintain records, data and other documents memorializing such information;

E)      An order requiring that Defendant NY Waterway train each of its ferry boat captains and/or operators to navigate and operate its ferry boats in a manner designed to limit the creation of dangerous and destructive wakes and waves prior to allowing any such captains operate its ferry boats;

F)      An order requiring that the wake wash of Defendant NY Waterway's ferries be permanently monitored by an independent entity appointed by the Court and paid for by Defendants to insure compliance with the above orders of the Court and that the results of said monitoring be reported to the Court on a set periodic basis;

G)      An order requiring that the schedule of Defendant NY Waterway's ferries be altered so as to decrease the number of landings of its ferries at Lincoln Harbor and the Hartz Ferry Slip so as to minimize the impact of the dangerous and damaging wakes caused by its ferries; specifically an order altering the present schedule during peak hours of landings at the Hartz Ferry Slip every 15 minutes to landings no more than every 30 minutes during peak hours;

H)      An order requiring that Defendants' use and operation of the Hartz Ferry Slip be limited by the 1988 ACE Ferry Landing Permit until such time as an environmental impact assessment can be performed and a full hearing can be had before the ACE on whether a new permit must be issued authorizing increased ferry landings without Defendants first paying for and installing protective seawalls and other attenuating systems around Plaintiffs' marina and in other locations, as determined necessary by the ACE;

I)      An order that Defendants, at their cost, by a date certain as established by the Court, install and thereafter maintain wake reduction devices such as seawalls and other attenuating systems to avoid the wakes created by the ferry boats upon Plaintiffs' piers, docks, marinas and vessels in the Hudson River, including at all necessary locations at the Lincoln Harbor Marina;

J)      An order requiring that Defendants' use and operation of the Hartz Ferry Slip and the Hartz Ferry Channel be prohibited until such time as Defendants have begun substantially and shall continue diligently and continuously to comply with the orders referred to in paragraphs (H) and (I) above.

168.    In addition, Plaintiffs seek monetary damages, including compensatory damages

because as a direct result of Defendants creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel so as to cause dangerous and destructive wakes and resulting physical impact upon vessels, docks, piers, wave screens, other infrastructure and equipment of Plaintiffs LHYCCA and LHE, Plaintiffs have suffered the following damages:

A)  Continuous property damage to the piers, docks, wave screens, other infrastructure and equipment at Lincoln Harbor Marina requiring extensive repairs, including the purchasing of materials and associated labor;

B)  Loss of business caused by tenants of Lincoln Harbor Marina refusing to renew leases on docks at Lincoln Harbor Marina specifically as the result of dangerous and damaging ferry wakes caused, permitted or contracted by Defendants, which have caused damage to vessels of tenants of Lincoln Harbor Marina, as well as personal injury to occupants of said vessels;

C)  Maintenance of piers, docks, wave screens, other infrastructure and equipment at Lincoln Harbor Marina necessarily performed to preserve the integrity of the such property on a basis significantly more frequently than normal as a result of the Defendants' creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel, with associated costs for labor and materials;

D)  Marked decrease in the value of the slips units owned in fee simple by LHE as a result of Defendants' creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel;

E)  Installation of wake protective devices required solely as a result of Defendants' creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel, so as to attempt to preserve the integrity of docks, piers, wave screens, other infrastructure and equipment at Lincoln Harbor Marina and to attempt to retain tenants adversely affected by said wakes, with associated costs of labor and materials.

F)  The necessity of the installation of additional wake protective devices in the event Defendants continue and do not abate creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel, so as to attempt to preserve the integrity of docks, piers, wave screens, other infrastructure and equipment at Lincoln Harbor Marina and to attempt to retain tenants adversely affected by said

wakes, with associated costs of labor and materials.

G) Diminution in value of the Lincoln Harbor Marina and its boat slips, business and other property and economic interests.

169. As a direct result of Defendants creating, permitting and contractually authorizing dangerous and damaging wakes by operation of the NY Waterway ferry boats and the Hartz Ferry Slip and Hartz Ferry Channel, Plaintiffs LHYCCA and LHE have suffered actual damages in the approximate amount of $10 million and continue to suffer damages on an on-going basis. All of such damages have accrued during the six-year limitations period provided by NJ Rev Stat § 2A:14-1 (2013).

170. As a direct result of Defendants' actions as aforesaid, Plaintiffs LHYCCA and LHE will suffer reasonably foreseeable future damages anticipated to exceed $15 million, an amount which will include the cost to discover, design, engineer, construct, install and implement presently unknown or untried effective wake abatement systems such as seawall systems.

WHEREFORE, Plaintiffs pray that this Court:

1. Enter judgment against Defendants in Plaintiffs' favor; and

2. Award the permanent injunctive relief set forth in the Complaint; and

3. Award damages, including punitive damages, against all Defendants in an amount to be determined at trial; and

4. Requiring that Defendants, after fully compensating Plaintiffs for all damages claimed herein, obtain all necessary permits and approvals for operation of NY Waterway ferries and the Hartz Ferry Slip should Defendants wish to seek to continue with such operations; and

5. Assessing penalties pursuant to N.J.S.A. 2A:35A-4a; and

6. Awarding attorneys' fees, expert witness fees and costs pursuant to N.J.S.A. 2:35A-10; and

7.    Award costs and attorneys' fees against all Defendants in favor of Plaintiffs, and

such other and further relief as this Court may deem just and proper.


Dated:  May 14, 2019
        New York, New York


By:  ___/s/ Benjamin R. Wilson_____
Benjamin R. Wilson
James H. Power (*pro hac vice* to be submitted)
Clayton J. Vignocchi
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 513-3200
Fax: (212) 385-9010
Email: benjamin.wilson@hklaw.com
        james.power@hklaw.com
        clayton.vignocchi@hklaw.com

*Attorneys for Plaintiffs*
*Lincoln Harbor Enterprises, LLC and Lincoln*
*Harbor Yacht Club Condominium Association, Inc.*