## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

<table>
<tr><td>

**LINCOLN HARBOR ENTERPRISES, LLC, and LINCOLN HARBOR YACHT CLUB CONDOMINIUM ASSOCIATION, INC.,**

      **Plaintiffs,**

      **v.**

**HARTZ MOUNTAIN INDUSTRIES, INC., and PORT IMPERIAL FERRY CORP. d/b/a NY WATERWAY,**

      **Defendants.**

</td><td>

Civ. No. 19-12520 (KM) (MAH)

**OPINION**

</td></tr>
</table>

**KEVIN MCNULTY, U.S.D.J.:**

      The Lincoln Harbor Marina comprises condominiums and boat slips on the Hudson River. The Marina is owned by Lincoln Harbor Enterprises, LLC, and managed by the Lincoln Harbor Yacht Club Condominium Association, Inc. (collectively "Lincoln"). Hartz Mountain Industries, Inc., developed most of the rest of the area known as Lincoln Harbor, including two ferry slips, which NY Waterway runs ferries from.

      After ferry traffic increased, Lincoln sued Hartz and NY Waterway, alleging tort and environmental claims. I dismissed the original complaint because Lincoln had not alleged specific harms or statutory violations. *Lincoln Harbor Enters., LLC v. Hartz Mt. Indus., Inc.*, Civ. No. 19-12520, 2020 WL 563634 (D.N.J. Feb. 4, 2020) ("*Lincoln I*"). Lincoln amended its complaint, and Hartz and NY Waterway move to dismiss some of the claims and for attorney's fees if they succeed. (DE 65.)[1] For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

---

[1]      Certain citations to the record are abbreviated as follows:

      DE = docket entry

I.   **BACKGROUND**

A. **Facts**

In the 1980's, Hartz began developing an area in Weehawken, New Jersey, that would become Lincoln Harbor, a mixed-use waterfront development. (Am. Compl. ¶ 14.) In 1988, Hartz obtained a permit from the United States Army Corps of Engineers (the federal agency that approves projects on rivers) to build two ferry slips in Lincoln Harbor. (Am. Compl. ¶ 16.) Hartz represented to the Corps, and the Corps likewise found, that ferry operation would be minimal and significant environmental impacts were not expected. (*Id.* ¶ 19; Corps Permit at 12.)

The New Jersey Department of Environmental Protection ("NJDEP") is also involved in permitting activities on the Hudson River. (*See* Am. Compl. ¶ 23.) Prior to receiving the Corps' approval, Hartz obtained a permit from NJDEP for a waterfront development. (NJDEP Permit.)[2] That permit, however, did not explicitly approve ferry operations or slips. (*See id.* at 1.)

Still, the Corps Permit, which specifically authorized such activity, stated that "[b]y letter dated 17 June 1988, the subject proposal has been approved for a modification-in-detail by" the NJDEP Permit. (Corps Permit at 13.) The Corps Permit also stated that the June 1988 letter (1) confirmed that Hartz's proposed activity "complie[d] with the New Jersey State Coastal Zone Management Program" and (2) "modified the existing" NJDEP Permit. (*Id.*) Upon

Am. Compl. = Amended Complaint (DE 58)

Mot. = Brief in Support of Hartz and NY Waterway's Joint Motion to Dismiss the Amended Complaint (DE 65-1)

Opp. = Lincoln's Opposition to the Joint Motion to Dismiss (DE 68)

Corps Permit = Army Corps of Engineers Permit No. 14905 (DE 58-2) (I will cite to the page numbers of the PDF)

NJDEP Permit = NJDEP Permit No. 85-0072-1 (DE 58-11)

[2]   Both the Corps and NJDEP Permits were attached to the Amended Complaint, so I may consider them on a motion to dismiss. *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020).

receiving the permits, Hartz contracted with NY Waterway to run ferries using the ferry slips. (Am. Compl. ¶¶ 15, 41.)

In the years since construction, both Lincoln Harbor and the ferry service have grown. (*Id.* ¶¶ 36–37.) Lincoln Harbor now offers business space, restaurants, retail, and luxury residences; and development continues. (*Id.*) The ferry service, too, has burgeoned. Now, NY Waterway operates ferries on weekdays every 15–20 minutes. (*Id.* ¶ 40.) Given the continued development, ferry traffic and demand will only increase. (*Id.* ¶¶ 37–38.)

But development has its drawbacks. The busy ferry traffic creates noise and frequent wakes. (*Id.* ¶¶ 43–44.) The Marina feels the brunt of those wakes, as Hartz left the Marina largely unprotected by any wake mitigation. (*Id.* ¶ 45.) As a result, wakes have damaged the Marina's structures and rendered boat slips unusable—even sinking some slips entirely. (*Id.* ¶¶ 45, 60.) Besides the noise and property damage, the ferries have also increased turbidity in the harbor, stirred up contaminated sediments that usually rest at the river bottom, and diminished the quality of habitats for fish and birds. (*Id.* ¶¶ 155–56.) As a result, Lincoln is not able to enjoy the use of its property. (*Id.* ¶ 79.) Moreover, because the wakes interfere with access to boat slips and the Marina, the public is not able to access the Hudson River for recreation. (*Id.* ¶¶ 53, 135.)

## B. Procedural History

Lincoln sued Hartz and NY Waterway, seeking damages and equitable relief for torts and environmental violations arising from the ferry operations. (DE 1.) I dismissed the statutory claims, finding that Lincoln had not alleged environmental harm that could be the basis for its environmental claims, and had not alleged specific statutory violations. *Lincoln I*, 2020 WL 563634, *3–5.

Lincoln submitted a proposed Amended Complaint. (DE 58.) The Amended Complaint asserts the following claims: (1) "Maritime Tort and State Tort Claims" against Hartz, (2) "Maritime Tort and State Tort Claims" against NY Waterway, (3) nuisance, (4) a claim under the New Jersey Environmental

Rights Act ("ERA"), N.J. Stat. Ann. §§ 2A:35A-1–2A:35A-14, for violations of various federal and state statutes and regulations, (5) a claim for violating a New Jersey boating regulation, N.J.A.C. § 13:82-1.7, (6) a claim for violating the Magnuson-Stevens Fishery Conservation Management Act, 16 U.S.C. §§ 1801–1881, and (7) an ERA claim that does not rely on any statutory or regulatory violations. (Am. Compl. ¶¶ 83–229.)

Hartz and NY Waterway asked me to "strike" the Amended Complaint for failure to cure the deficiencies of the original complaint. (DE 61.) I explained that such relief could not be sought by letter, but that the parties could confer on a briefing schedule for a motion to dismiss, if that was what Hartz and NY Waterway had intended. (DE 62.) The parties agreed to a schedule, and Hartz and NY Waterway moved to dismiss "the statutory claims." (DE 64, 65.) More specifically, Hartz and NY Waterway seem to seek dismissal of Counts 4–7 in their entirety, as they are statutory claims. They also seek to dismiss Counts 1–3, which sound in negligence and nuisance, to the extent their tort theories rest on statutory violations. Because the ERA has a fee-shifting provision, Hartz and NY Waterway also seek attorney's fees if the Court dismisses the ERA claims.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint

as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

## III.   DISCUSSION

The motion principally concerns the ERA claims.[3] As a brief overview, the ERA's cause-of-action section has two parts. Section 4(a) provides that a person may bring an action against someone for "continuously or intermittently" violating "any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment." N.J. Stat. Ann. § 2A:35A-4(a). Section 4(b) provides that "[e]xcept in those instances where the conduct complained of constitutes a violation of a statute, regulation or ordinance which establishes a more specific standard for the control of pollution, impairment or destruction of the environment," a person may bring a declaratory and equitable action "for the protection of the environment . . . from pollution, impairment or destruction." *Id.* § 2A:35A-4(b). Both claims thus require "pollution, impairment or destruction of the environment." Finally, any ERA claim requires pre-suit notice to affected agencies and parties.

Lincoln brings a claim under section 4(a) alleging violations of statutes and regulations (Count 4) and a claim under section 4(b) (Count 7) which is not based on any statutory or regulatory violation. As a threshold issue, I address whether Lincoln satisfied the notice requirement. (Section III.A, *infra*.) I next address whether Lincoln alleges environmental harm. (Section III.B, *infra*.) The section 4(a) claim requires plausible allegations that Hartz and NY Waterway are violating predicate laws, so I address whether Lincoln makes such allegations. (Section III.C, *infra*.) I then address whether Lincoln has alleged a section 4(b) claim that does not rely on predicate violations. (Section III.D, *infra*.) After dealing with those claims, I assess what remains of this case and

---

[3]   The New Jersey boating regulation and Magnuson-Stevens Act claims are pleaded as separate counts (Counts 5 and 6), but the Amended Complaint states, and Lincoln's brief confirms, that the vehicle for these claims is the ERA. (Am. Compl. ¶¶ 217–18, 224–25; Opp. at 30, 37.) So I analyze them as ERA claims.

where it goes from here. (Section III.E., *infra*.) And finally, I dispose of the request for attorney's fees. (Section III.F, *infra*.)

## A. Notice

At the threshold, Hartz and NY Waterway argue that Lincoln did not provide the statutorily mandated pre-suit notice. (Mot. at 7–8.) The ERA indeed has a notice requirement:

> No action may be commenced pursuant to this act unless the person seeking to commence such suit shall, at least 30 days prior to the commencement thereof, direct a written notice of such intention by certified mail, to the Attorney General, [NJDEP], the governing body of the municipality in which the alleged conduct has, or is likely to occur, and to the intended defendant . . . .

N.J. Stat. Ann. § 2A:35A-11. Such notice is a "mandatory condition precedent to bringing" an ERA claim. *Player v. Motiva Enter., LLC*, 240 F. App'x 513, 524 (3d Cir. 2007).

Hartz and NY Waterway do not dispute that Lincoln satisfied the notice requirement prior to filing the original complaint. Nonetheless, they argue that such notice has become insufficient because the Amended Complaint asserts "new ERA claims" relying on additional statutes and harms. (Mot. at 8–11.) These arguments turn on the meaning of the notice requirement: Must a plaintiff provide notice whenever a new ERA claim is asserted? Or is more general notice of the lawsuit sufficient? In short, how specific must the notice be?

The language relevant to these issues is this: "No *action* may be commenced pursuant to this act unless the person seeking to commence such suit shall . . . direct a written notice *of such intention*." N.J. Stat. Ann. § 2A:35A-11 (emphases added). So an ERA plaintiff must provide notice of its intent to bring an "action." But does "action" mean an ERA *claim* such that Lincoln needed to provide notice of ERA claims raised for the first time in its Amended Complaint? Or does "action" mean an ERA *lawsuit* such that Lincoln's original notice is sufficient for the life of this lawsuit?

To interpret "action," I look to its "ordinary meaning." *Matter of Ridgefield Park Bd. of Educ.*, 236 A.3d 922, 932 (N.J. 2020) (citation omitted). Courts, albeit outside New Jersey, have held that "[t]he ordinary meaning of 'action' is the entire lawsuit," not any individual claim therein. *Brown v. Megg*, 857 F.3d 287, 291 (5th Cir. 2017); *see also Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 775 (7th Cir. 2003). Indeed, Black's Law Dictionary, a relevant tool when construing legal terms in a New Jersey statute, *see Alan J. Cornblatt, P.A. v. Barow*, 708 A.2d 401, 408 (N.J. 1998), defines "action" as "[a] civil or criminal judicial proceeding," *Action*, Black's Law Dictionary (11th ed. 2019) (def. 4), while defining "claim" as "part of a complaint in a civil action," *id.* at *Claim* (def. 3). Thus, the ordinary meaning of "action" undercuts Hartz and NY Waterway's arguments. That is, Lincoln only needed to provide notice that it was commencing a civil proceeding involving the ERA.

The purpose of the notice requirement confirms this reading. I "must construe the statute sensibly and consistent with the objectives that the Legislature sought to achieve." *State v. Morrison*, 151 A.3d 561, 568 (N.J. 2016) (citation omitted). The only precedential opinion to construe N.J. Stat. Ann. § 2A:35A-11 explained that, because primary environmental enforcement authority in New Jersey rests with NJDEP, the notice requirement ensures that NJDEP is aware of lawsuits that may overlap with its efforts and can decide whether to get involved. *Howell Township v. Waste Disposal, Inc.*, 504 A.2d 19, 26 (N.J. Super. Ct. App. Div. 1986). Accordingly, the purpose of the notice requirement was served, at least in this case, by Lincoln's original notice. NJDEP was made aware that Lincoln would bring an ERA lawsuit related to wakes caused by Hartz and NY Waterway, and NJDEP could decide whether it should get involved. The purpose of the notice requirement is not materially furthered by requiring a plaintiff who has already provided notice of a lawsuit to again notify NJDEP every time claims are tweaked. Surely, once the lawsuit is commenced, service of a proposed amended complaint, or a notice of motion to amend the complaint, is sufficient to alert the other party. Pre-suit notice, on

the other hand, serves the separate function of warning NJDEP that an ERA lawsuit is coming, and conveying the gist of it, so that NJDEP can exercise its "value judgments" and perhaps make a threshold decision whether to invest resources in defending the action. *Id.*

To require that an ERA plaintiff provide additional notice whenever it alters its ERA claim would lead to absurd results. *See Morrison*, 151 A.3d at 568 ("We will not adopt an interpretation . . . that leads to an absurd result or one that is distinctly at odds with the public-policy objectives of a statutory scheme."). For example, if a notice stated that the ERA claim arose from conduct harming a particular population of a specific species, and discovery reveals that another population has also been harmed, would the plaintiff need to notify NJDEP *before* including arguments regarding that population in a motion for summary judgment? Or could it just notify NJDEP directly by simply making the arguments? Or consider a literal application of the rule that notice be provided as to each individual claim before an action is *commenced*. If additional harms are identified in discovery, must a plaintiff dismiss the action, give new ERA notice, wait 30 days, and then recommence the action? Such a merry-go-round would be pointless.

Plainly, then, Lincoln's notice was sufficient. It apprised the stakeholders of the ERA suit and, to boot, provided myriad factual and legal details. (DE 59-9.) That the specifics of the ERA claims are somewhat different in the Amended Complaint is of no significance. Stakeholders received notice of Lincoln's "intention" to bring an ERA "action," and that action continues.

To the extent Hartz and NY Waterway move to dismiss the Amended Complaint for failure to provide pre-suit notice, their motion is denied.

## B. Environmental Harm

An ERA claim requires that the defendant's conduct caused "pollution, impairment or destruction of the environment." *Lincoln I*, 2020 WL 563634, *3–4. Such harms can include "water pollution," "excessive noise," and "impairment . . . of rivers." N.J. Stat. Ann. § 2A:35A-3(b).

8

I dismissed the original complaint because it "[gave] no indication of what aspect of the 'environment' has been damaged, or how exactly the wakes have done [so]." *Lincoln I*, 2020 WL 563634, *4. Now, the Amended Complaint alleges that the ferry traffic and wakes have caused noise, suspension of contaminated sediments, disturbances to aquatic and avian populations, and erosion. (Am. Compl. ¶ 155–56.) The Amended Complaint also alleges that these harms will continue because the ferries have not adjusted their schedules. (*Id.* ¶ 154.)

Hartz and NY Waterway argue that these additional allegations are too conclusory. (Mot. at 15–18). I disagree; the Amended Complaint adds enough factual allegations to make it plausible that the ferries cause environmental harm. In other words, rather than simply alleging that environmental harm has occurred, the Amended Complaint identifies particular harms, such as the stirring up of contaminants. Accordingly, the Amended Complaint does not merely "alleg[e] the conclusion to an ultimate legal issue" (environmental harm) but provides facts relevant to that issue. *Martinez v. UPMC Susquehanna*, --- F.3d ---, ---, No. 19-2866, 2021 WL 298730, at *3 (3d Cir. Jan. 29, 2021). Noise, erosion, and contaminant dispersal are "factual allegation[s], not [] legal one[s]," *id.*, so they suffice. Thus, the Amended Complaint sufficiently alleges environmental harm for purposes of stating an ERA claim.

I note here, however, a related issue unaddressed by the parties but that will require attention going forward: standing. I have an independent obligation to assure myself of standing. *Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020). While the ERA textually allows a plaintiff to bring suit to enjoin environmental harms *generally*, Article III requires that Lincoln *personally* suffered those harms. *See Schuchardt v. Pres. of the U.S.*, 839 F.3d 336, 344 (3d Cir. 2016) ("A particularized Article III injury is one that affects the plaintiff in a personal and individual way." (quotation marks, alterations, and citation omitted)). In other words, Lincoln must show how noise, suspension of contaminated sediments, disturbances to animals and habitats, and erosion are not just injuries to the environment, but

injuries to Lincoln. As to noise, suspension of sediments, and erosion, I can readily see how those things injure Lincoln—noise, contaminated water, and erosion all make the Marina a less enjoyable place.

Whether injuries to species along the Hudson River also represent injuries to Lincoln is a closer call.[4] A plaintiff cannot rely only on a generalized interest in seeing a species flourish. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992). Rather, a plaintiff must show not only that the defendant's activities harm the species, but that the plaintiff is "directly affected" by such harm. *Id.* at 563 (quotation marks and citations omitted). Lincoln has not alleged that it relies on animal life or habitats in any way. Indeed, it is hard to see how, for example, the ferries' impact on finfish migratory patterns has any effect on a condo association. (*See* Am. Compl. ¶ 176.) Lincoln has not even alleged that certain species somehow add to its property value or condo owners' enjoyment of their property.

Nonetheless, I find one theory in the Amended Complaint that supports standing to pursue claims based on harms to Hudson River species. The Amended Complaint alleges that (1) the wakes impede use of and access to the Marina, and (2) boat slip owners and the public rely on the Marina to access the Hudson River for recreational activities. (*Id.* ¶¶ 53, 135.) I can infer that enjoyment of the River includes enjoyment of its flora and fauna. So Lincoln can pursue species-based theories because Lincoln is in the business of providing access to the Hudson River and its offerings, and ferry wakes negatively impact Lincoln's ability to do so.

_____

[4]     Some of Lincoln's ERA claims are premised on violations of laws protecting species and habitats. (Sections III.C.3.c, e, f, j; III.C.5, *infra*.) "[A] plaintiff who raises multiple causes of action must demonstrate standing for each claim he seeks to press." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012) (quotation marks and citation omitted). As a result, I must assure myself that Lincoln has standing to pursue those claims, *i.e.*, that harm to species represents harm to Lincoln. It is not sufficient that Lincoln has standing based on noise, contaminated water, and erosion injuries. *Id.* ("[S]tanding is not dispensed in gross[.]").

Admittedly, this theory may raise issues of fact. Still, "in the context of a motion to dismiss, . . . the [i]njury-in-fact element is not Mount Everest. The contours of the injury-in-fact requirement . . . are very generous, requiring only that claimant allege some specific, identifiable trifle of injury." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (alterations and citation omitted). Lincoln's river-access theory surmounts that low bar. *Id.* But if Lincoln intends to rely on this injury going forward, or any of the injuries for that matter, it will need to provide factual support commensurate with its burden at each stage of this case. *Lujan*, 504 U.S. at 561. For now, Lincoln has alleged standing and can proceed.

## C. Predicate Violations

Section 4(a) allows a plaintiff to sue for violations of environmental statutes or regulations. N.J. Stat. Ann. § 2A:35A-4(a). Lincoln predicates its section 4(a) claim on violations of (1) the Rivers and Harbors Act, (2) the Coastal Zone Management Act, (3) the New Jersey Coastal Zone Management Rules, (4) a New Jersey boating regulation, and (5) the Magnuson-Stevens Act. (Am. Compl. ¶¶ 149, 217–18, 224–25.) I address each alleged violation in turn and find that none is plausible.

### 1. Rivers and Harbors Act

The Amended Complaint alleges that Hartz and NY Waterway are violating section 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403. (Am. Compl. ¶¶ 186–95.) "Section 10 delegates authority to the Corps to issue permits for projects that impact on the navigability of United States waters." *All. To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 107 n.1 (1st Cir. 2005). Lincoln alleges that Hartz did not obtain a proper permit for repairs to the ferry slip in 2019. (Am. Compl. ¶¶ 193, 195.) This theory relies on two aspects of the RHA, which I canvas before turning to the allegations.

First, the Corps requires individual permits "for structures or work in or affecting navigable waters of the United States." 33 C.F.R. § 322.5(a). The

Corps may also, "either on his own motion, at the request of the permittee, or a third party, or as the result of periodic progress inspections," reevaluate permits after they are issued and decide whether they require modification. *Id.* § 325.7(a). Modifications involve their own procedure different from the process for an initial permit application. *See id.* § 325.7(b). However, when there are "[s]ignificant increases in scope of a permitted activity," then the new-permit procedure, not the modification procedure, must be used. *Id.* § 325.7(a).

Second, while the Corps generally requires permits for individual activities, the Corps also issues nationwide permits (NWPs), "a type of general permit . . . designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b). NWPs effectively operate as regulations of general application that allow certain structures or activities without an individual permit. *Id.* § 330.1(b), (c), (e)(1). The NWP relevant to this case is NWP 3, which authorizes the "repair, rehabilitation, or replacement of any previously authorized, currently serviceable structure or fill . . . provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it." Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1860, 1984 (Jan. 6, 2017).

Certain NWPs require the permittee to notify the Corps ahead of time that the permittee intends to conduct an NWP-authorized activity. 33 C.F.R. § 330.1(e)(1); Nationwide Permits, 82 Fed. Reg. at 1877. The Corps can then review the notice and ensure that the proposed activity indeed qualifies under the NWP. Nationwide Permits, 82 Fed. Reg. at 1878. If the Corps finds that the activity does not qualify, the Corps will notify a permittee and instruct the permittee how to proceed. *Id.* If the Corps finds that the activity does qualify, the Corps may so notify the permittee or—an alternative relevant to this case— a permittee can assume that the Corps authorizes the activity if the Corps does not respond within 45 days. *Id.*; *see also* 33 C.F.R. § 330.1(e)(1).

Lincoln alleges that Hartz notified the Corps in 2019 of its intent to rely on NWP 3 to make repairs and proceeded with those repairs. But because

12

those repairs (along with the ferry slip's activities more generally) constituted "[s]ignificant increases in scope of a permitted activity," Hartz allegedly should have been required to apply for a new permit pursuant to § 325.7(a). (Am. Compl. ¶¶ 191–93.)

Lincoln has not alleged any RHA violation. Hartz could proceed with the repairs without affirmative authorization from the Corps following its notice because Hartz did not receive word in 45 days from the Corps that it had disapproved the project. 33 C.F.R. § 330.1(e)(1). Moreover, § 325.7(a) did not impose an obligation on Hartz to request a new permit instead of relying on an NWP. Section 325.7(a) imposes an obligation *on the Corps* to require new applications when there are significant increases in activity. In other words, § 325.7 allows the Corps to review permits and modify them, but where circumstances have changed too much, the Corps must abandon the modification process and require a new permit instead. Section 325.7 says nothing about *a permittee's* obligations. In particular, it does not require a permittee that relies on NWP 3 to take upon itself the determination whether the increase in activity is so significant as to require a new permit. In fact, there does not appear to be authority for the proposition that NWP 3 and § 325.7 interact at all. *See United States v. Irizarry*, 98 F. Supp. 2d 160, 168 (D.P.R. 2000) ("[I]t is clear that 33 CFR 325.7 does not apply to NWP's."). Accordingly, to the extent Lincoln's ERA claim is based on an RHA violation, it is dismissed.

### 2. Coastal Zone Management Act

The Amended Complaint alleges that Hartz and NY Waterway are violating the Coastal Zone Management Act of 1972 ("CZMA"), 16 U.S.C. §§ 1451–1464. (Am. Compl. ¶ 162.) The CZMA seeks to manage and conserve the coasts. *Sec'y of the Interior v. California*, 464 U.S. 312, 316 (1984). To that end, the CZMA encourages states, mainly via grants, to develop coastal management programs. *Id.* When someone applies for a federal permit to conduct an activity in a coastal zone, the applicant must certify that the

proposed activity complies with the state's program. 16 U.S.C. § 1456(c)(3)(A); *see also N.J. Dep't of Envtl. Protect. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 419 (3d Cir. 1994).

Hartz obtained such a determination from NJDEP when applying for the Corps Permit. (Corps Permit at 13.) Yet Lincoln alleges that current operations are extending beyond what was approved by the Corps Permit, and so, under the CZMA, Hartz must obtain a new determination from NJDEP. (*See* Am. Compl. ¶¶ 162, 165–66.) However, the relevant section of the CZMA only imposes an obligation to get a determination from the state when *applying* for a permit. 16 U.S.C. § 1456(c)(3)(A). The provision does not speak to whether another determination is required if activities come to exceed what was originally permitted. The Amended Complaint does not point to any other specific, statutory provision for this proffered requirement. As a result, the Amended Complaint does not provide any way for me to infer that Hartz is violating the CZMA. Thus, to the extent Lincoln's ERA claim is based on a CZMA violation, it is dismissed.

### 3. New Jersey Coastal Zone Management Rules

The Amended Complaint alleges that Hartz and NY Waterway are violating a dozen New Jersey Coastal Zone Management Rules ("CZM Rules"), N.J.A.C. §§ 7:7-1.1 *et seq.* CZM Rules regulate New Jersey's coastal areas and provide a permitting process used by NJDEP for coastal activities. *Id.* § 7:7-1.1.[5] I address each alleged violation in turn, finding that none survives.[6]

---

[5] The Amended Complaint at times alleges that Hartz and NY Waterway are violating the CZM Rules *and* the Waterfront Development Act ("WDA"), N.J. Stat. Ann. § 12:5-1. The CZM Rules are promulgated to implement the WDA, N.J.A.C. § 7:7-1.1(a), and the Amended Complaint cites no specific violations of the WDA. So I assume any WDA violations are really CZM Rule violations.

[6] A preliminary note: The Amended Complaint, as well as the briefs, rely on the current version of CZM Rules. However, the thrust of the Amended Complaint is that Hartz violated CZM Rules at the time it sought its original permit (1988). The CZM Rules have gone through extensive amendments since their adoption in 1978. *E.g.*, 10 N.J. Reg. 184(a) (May 4, 1978) (adopting rules); *In re Protest of Coastal Permit Program Rules*, 807 A.2d 198, 209–10 (N.J. Super. Ct. App. Div. 2002) (providing history of

### a. Permit

Lincoln alleges that CZM Rules required Hartz to obtain a permit from NJDEP, which Hartz never did. (Am. Compl. ¶ 169 (citing N.J.A.C. § 7:7-8).) Although the Amended Complaint attaches Hartz's NJDEP permit, Lincoln alleges that this permit could not have approved the ferry operations because it makes no mention of ferries or slips. (Am. Compl. ¶ 171.) The Corps Permit belies Lincoln's allegations by noting that NJDEP apprised the Corps in a 1988 letter that the permit was modified and that Hartz complied with NJDEP rules. To the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-8, it is dismissed.

### b. Environmental Impact Statement

Lincoln alleges that CZM Rules require permit applicants include an environmental impact statement ("EIS") (a document that describes the project and its environmental effects), which Hartz never did. (Am. Compl. ¶ 175 (citing N.J.A.C. § 7:7-23.6(b)(1), (2)).) Again, the permit documents contradict this claim. NJDEP confirmed that Hartz had complied with the CZM Rules, which would include completing an EIS, if necessary. (Corps Permit at 13.) Moreover,

---

major overhaul in 2000); 47 N.J. Reg. 1392(a) (July 6, 2015) (adopting another reorganization). Nonetheless, I proceed to decide Lincoln's CZM Rule-based claims for two reasons.

First, "[f]ederal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). Thus, it would not be right for me to dismiss the CZM Rule-based claims simply because Lincoln did not cite the precise regulation when I can gather the legal gist of the claim. *See id.* (holding that court erred in dismissing constitutional claim for not expressly invoking 42 U.S.C. § 1983).

Second, Hartz and NY Waterway have not moved to dismiss the CZM Rule-based claims on the grounds that the relevant rule was not in place in 1988 or that the current rule does not reflect Hartz's obligations in 1988. Any such argument is, thus, forfeited. *See Gap Props., LLC v. Cairo*, Civ. No. 19-20117, 2020 WL 7183509, at *8 (D.N.J. Sept. 17, 2020). A finding of forfeiture is especially warranted here because prior versions of the CZM Rules are not easily available, and it is Hartz and NY Waterway's burden—not this Court's—to locate such materials if they are indeed to be a basis for dismissal.

the Corps Permit included a page where Hartz and the Corps attested that an environmental assessment had been completed, and NJDEP specifically concurred with the assessment. (*Id.* at 20.)[7] As a result, I cannot infer that Hartz failed to comply with an EIS requirement when NJDEP effectively certified that it had. To the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-23.6, it is dismissed.

### c. Finfish Mitigating Measures

Lincoln alleges that CZM Rules require mitigating measures for any development interfering with certain fish migratory patterns, and Hartz has never performed such measures. (Am. Compl. ¶ 176 (citing N.J.A.C. § 7:7-9.5).) CZM Rules provide that "[f]infish migratory pathways are waterways [including rivers] which can be determined to serve as passageways for diadromous fish to or from seasonal spawning areas . . . including those portions of the Hudson and Delaware Rivers within the coastal zone boundary." N.J.A.C. § 7:7-9.5(a). CZM Rules prohibit "[d]evelopment" that "creates a physical barrier to the movement of fish along finfish migratory pathway," "lowers water quality to such an extent as to interfere with the movement of fish along finfish migratory pathways," or "rais[es] turbidity levels during migration periods," "unless acceptable mitigating measures" are used. *Id.* § 7:7-9.5(b), (c)(1). Lincoln alleges that ferry operations disturb fish migratory pathways by increasing turbidity and stirring up sediment. (Am. Compl. ¶ 176.)

The Amended Complaint does not plausibly allege a violation of this Rule. It only parrots the Rule language; it does not provide any factual

---

[7] The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370f, provides that federal agencies must prepare an EIS for major federal actions, but agencies may first or instead prepare an environmental assessment ("EA") to determine whether an EIS is needed. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004). It appears that the Corps and Hartz had completed an EA and determined that no EIS was needed, at least under NEPA. (Corps Permit at 20.) It is unclear whether NEPA's and the CMZ Rules' standards for an EIS are the same. But the fact that NJDEP concurred with the Corps and Hartz's EA means that it is implausible that the EA document or procedure did not also satisfy the CZM Rules.

allegations. The Rule's text is specific: the development activity must physically impede the movement of fish along a pathway, lower water quality "*to such extent as to interfere*" with such movement, or raise turbidity levels "*during migration periods.*" *Id.* § 7:7-9.5(b), (c)(1) (emphases added). The Rule thus indicates that there must be a specific, identifiable impact on particular fish populations at specific times. Yet the Amended Complaint only generally alleges that ferry activities impact fish migration—it gives no supporting facts.[8] A violation is therefore not plausibly, factually alleged. To the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-9.5, it is dismissed.

### d. Marina Moorings

Lincoln alleges that ferry activity detracts from recreational boating in marina mooring areas, in violation of N.J.A.C. § 7:7-9.10. (Am. Compl. ¶ 177.) CZM Rules provide that "[m]arina moorings are areas of water that provide mooring, docking and boat maneuvering room as well as access to land and navigational channels for five or more recreational boats." N.J.A.C. § 7:7-9.10(a). The Rules further provide that "[a]ny use that would detract from existing or proposed recreational boating use in marina mooring areas is *discouraged.*" *Id.* § 7:7-9.10(c) (emphasis added).

This claim fails because the CZM Rule does not create an enforceable right; it goes no farther than to "discourage" certain kinds of activity. N.J.A.C. § 7:7-9.10(c). "Discouraged" means that a proposed activity "is likely to be rejected or denied" by NJDEP when it reviews applications because it is NJDEP policy that such uses should be "deterred." *Id.* § 7:7-1.5. NJDEP may nonetheless still approve the activity if it is "in the public interest" and "mitigating or compensating measures can be taken." *Id.* Thus, CZM Rules that

---

[8]   To be sure, the Amended Complaint attaches, though barely discusses, a report commissioned by Hartz on the impact of pier repairs in 2008 on fish habitats. (DE 58-12.) But this report does not push Lincoln over the plausibility line for two reasons. First, the report was only concerned with pier repairs; it does not speak to ferry operations or even the ferry slip in general—the basis for Lincoln's claims. Second, the report finds that impacts would be minimal. (*Id.* at 21.)

"discourage" an activity do not prohibit it but instead provide guidance to NJDEP when reviewing applications. *In re Stream Encroachment Permit*, 955 A.2d 964, 975–76 (N.J. Super. Ct. App. Div. 2008) (citing prior version). In other words, and to borrow from federal administrative law, this CZM Rule seems more like a policy statement to guide agency discretion rather than a regulation—and so cannot provide relief to a plaintiff. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (Kavanaugh, J.).

The language is frankly precatory. Lincoln cannot base a claim on a CZM Rule that merely discourages an activity because it does not set forth an enforceable obligation. Thus, to the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-9.10, it is dismissed.

### e. Endangered or Threatened Wildlife or Plant Species Habitats

CZM Rules prohibit development in habitats of endangered or threatened species without mitigating measures, which Lincoln alleges Hartz never did. (Am. Compl. ¶ 178 (citing N.J.A.C. § 7:7-9.36(a)).) CZM Rules define "[e]ndangered or threatened wildlife or plant species habitats" as "areas known to be inhabited" by "species on official Federal or State lists of endangered or threatened species." N.J.A.C. § 7:7-9.36(a). One such area is the Hudson River. *See id.* § 7:7-9.36(a)(1) (noting that the areas with designated habitats are provided in NJDEP's "Landscape Maps"); NJDEP, Div. of Fish & Wildlife, "New Jersey's Landscape Project," https://www.state.nj.us/dep/fgw/ensp/landscape/ (last visited Feb. 2, 2021) (link to map application showing Hudson River designation). "Development" of such habitat is "prohibited unless it can be demonstrated, through an endangered or threatened wildlife or plant species impact assessment" that the habitat would not be "adversely affected." *Id.* § 7:7-9.36(b).

This claim fails, again because of the Corps Permit. Because NJDEP itself confirmed that Hartz had complied with the CZM Rules (Corps Permit at 13), it is implausible that Hartz failed to comply with this Rule. To the extent

Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-9.36, it is dismissed.

### f. Critical Wildlife Habitat

Lincoln alleges that CZM Rules prohibit development in critical wildlife habitats without mitigating measures, and Hartz never performed any such mitigating measures. (Am. Compl. ¶ 179 (citing N.J.A.C. § 7:7-9.37).) CZM Rules define "[c]ritical wildlife habitats" as "specific areas known to serve an essential role in maintaining wildlife." N.J.A.C. § 7:7-9.37(a). The Rules then explain that only one area has been so designated and other "sites will be considered on a case-by-case basis." *Id.* § 7:7-9.37(a)(3). The Rules provide that development that would "adversely affect" critical wildlife habitats is "discouraged" unless mitigating measures are proposed. *Id.* § 7:7-9.37(c).

This claim fails for three reasons. First, the Amended Complaint does not allege factually that the Lincoln Harbor area qualifies as a critical wildlife habitat, and such a designation is not otherwise publicly available or judicially noticeable. Second, the Rule is only triggered *if* the development would adversely affect a critical wildlife habitat, and the Amended Complaint alleges no facts to that effect. Third, as in the marina moorings rule, this Rule's use of "discouraged" suggests that it does not set forth a legally binding obligation. Thus, to the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-9.37, it is dismissed.

### g. Public Trust

Lincoln alleges that ferry traffic has damaged tidal waterways and shores, which are subject to public trust rights. (Am. Compl. ¶¶ 180, 184 (citing N.J.A.C. §§ 7:7-9.48(b), 7:7-16.9).) CZM Rules state that "[p]ublic access to lands and waters subject to public trust rights shall be provided in accordance with the public access rule, N.J.A.C. 7:7-16.9." N.J.A.C. § 7:7-9.48(b). The Hudson River Waterfront Area is subject to public trust rights. *Id.* § 7:7-9.46(c). However, the public access rule is one of the longest CZM Rules, with a plethora of provisions, yet the Amended Complaint does not identify any

19

specific provision which Hartz and NY Waterway have violated. This is needle-in-a-haystack pleading; fairness requires more specificity. To the extent Lincoln's ERA claim is based on violations of N.J.A.C. §§ 7:7-9.48 and 7:7-16.9, it is dismissed.

### h. Dredging

Lincoln alleges that ferry activity violates CZM Rules regulating dredging. (Am. Compl. ¶ 181 (citing N.J.A.C. §§ 7:7-12.6(e), 7:7-12.7(d)).) CZM Rules provide that "[p]ropwash dredging, which is the movement of sediment by resuspending accumulated material by scouring the bottom with boat propellers or specially designed equipment with propellers, is prohibited." N.J.A.C. §§ 7:7-12.6(e), 7:7-12.7(d). The Amended Complaint does not plausibly allege that the ferry activities meet that definition. There are no factual allegations that the ferry's propellers scour "*the bottom*" of the Hudson River, and it is not a reasonable or commonplace inference that commuter ferry propellers touch the river bottom. Thus, to the extent Lincoln's ERA claim is based on violations of N.J.A.C. §§ 7:7-12.6(e) and 7:7-12.7(d), it is dismissed.

### i. Miscellaneous Uses

Lincoln alleges that Hartz and NY Waterway never sought approval for "miscellaneous uses." (Am. Compl. ¶ 182 (citing N.J.A.C. § 7:7-12.24).) CZM Rules provide that different types of development are subject to different use rules. N.J.A.C. § 7:7-15.1. The Rules provide that "[m]iscellaneous uses are uses of water areas not specifically . . . addressed in the use rules" and "will be analyzed on a case-by-case basis to ensure that adverse impacts are minimized." *Id.* § 7:7-12.24(a), (b). Lincoln alleges that Hartz and NY Waterway violated the miscellaneous use rule because they never submitted their ferry operation plans to NJDEP for a case-by-case analysis. (Am. Compl. ¶ 182.)

This claim fails because the miscellaneous use rule does not speak of any affirmative obligation on a permittee to submit information regarding a miscellaneous use. Rather, the Rule simply explains that NJDEP, when reviewing applications, will consider activities not otherwise falling into a

regulatory category on a case-by-case basis. The Rule does not tell a permittee what it can and cannot do. Thus, to the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-12.24, it is dismissed.

### j. Marine Fish

Lincoln alleges that the ferry activities violate protections for marine fish. (Am. Compl. ¶ 183 (citing N.J.A.C. § 7:7-16.2(b)).) CZM Rules provide that "any activity that would adversely impact the natural functioning of marine fish . . . is discouraged." N.J.A.C. § 7:7-16.2(b). This claim fails for two reasons. First, the Amended Complaint largely repeats the statutory language and does not provide any factual allegations allowing an inference that marine fish are actually being harmed. Second, as explained, the use of "discouraged" does not create any legal obligations. Thus, to the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-16.2(b), it is dismissed.

### k. Buffers

Lincoln alleges that Hartz and NY Waterway failed to comply with rules regarding adjacent land uses and the need to place buffers between such uses. (Am. Compl. ¶ 185 (citing N.J.A.C. § 7:7-16:11).) CZM Rules provides that "[d]evelopment that is likely to adversely affect adjacent areas . . . is prohibited unless the impact is mitigated by an adequate buffer." N.J.A.C. § 7:7-16:11(b)(1). "Buffers" are defined as "natural or man-made areas, structures, or objects that serve to separate distinct uses or areas." *Id.* § 7:7-16:11(a). "The purpose, width, and type of the required buffer . . . shall be determined on a case-by-case basis." *Id.* § 7:7-16:11(b)(1).

This claim fails because the Rule suggests that NJDEP makes the decision as to what buffer is required *during the permitting process. See id.* § 7:7-16:11(b)(1). Hartz and NY Waterway might be liable if, for example, NJDEP required a buffer and they refused to implement it, but not for failing to come up with the requirement on their own. Thus, to the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 7:7-16.11(b), it is dismissed.

### 4.  New Jersey Boating Regulation

Lincoln alleges a violation of N.J.A.C. § 13:82-1.7, a boating regulation. (Am. Compl., Count 5.) The regulation provides that "[n]o person shall operate a vessel in a manner where the speed and/or wake of the vessel may cause danger or injury to life or limb or damage to property." N.J.A.C. § 13:82-1.7(a). The regulation further provides that "[a]ll vessels shall reduce speed to slow speed/no wake when passing . . . [a]ny marina, pier, dock, wharf or abutment at a distance of 200 feet or less." *Id.* § 13:82-1.7(b)(1).

This boating regulation cannot be the basis for an ERA claim. The ERA provides for claims based on regulations "designed to prevent or minimize pollution, impairment or destruction of the environment." N.J. Stat. Ann. § 2A:35A-4(a). This regulation is contained in the Administrative Code's "Law and Public Safety" title and a chapter called "Boating Regulations." These regulations are aimed at regulating boat safety. *See, e.g.*, N.J.A.C. §§ 13:82-1.6 (prohibiting use of sirens), 13:82-1.15 (requiring boat operators to wear safety switch lanyards). There is no indication that the Department of Law and Public Safety, the agency responsible for these regulations, "designed" them to prevent environmental harms. Accordingly, they cannot be a predicate for an ERA claim. Thus, to the extent Lincoln's ERA claim is based on a violation of N.J.A.C. § 13:82-1.7, it is dismissed.

### 5.  Magnuson-Stevens Act

Lincoln alleges a violation of the Magnuson-Stevens Act ("MSA"). (Am. Compl., Count 6.) The MSA provides for a "comprehensive national fisheries management program" to protect the nation's fisheries. *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 108–09 (3d Cir. 2011). Lincoln alleges that Hartz and NY Waterway specifically violated MSA provisions requiring that federal agencies consult with the Secretary of Commerce (who implements the MSA) regarding actions "that may adversely affect any essential fish habitat." 16 U.S.C. § 1855(b)(2)–(4). These are obligations on federal agencies, not private parties. Accordingly, the Amended

Complaint does not allege that Hartz and NY Waterway violated the MSA, as the relied-upon provision says nothing as to their legal obligations. Thus, to the extent Lincoln's ERA claim is based on an MSA violation, it is dismissed.

* * *

Although the complaint, in its amended form, adds a host of statutory and regulatory violations, none is plausible. As a result, Lincoln fails to state an ERA claim under section 4(a). For those reasons, Counts 4, 5, and 6 of the Amended Complaint are dismissed.

### D. Section 4(b)

The Amended Complaint adds a claim (Count 7), premised on section 4(b), that does not rely on any predicate violations. The parties dispute whether such a claim is cognizable.

There is no binding authority authorizing a standalone section 4(b) claim with no predicate violation. The Third Circuit once touched on the issue in a case where New Jersey adopted, pursuant to a federal statute, an "action plan" for constructing a highway. *Springfield Township v. Lewis*, 702 F.2d 426, 452 (3d Cir. 1983). Plaintiffs challenged that construction, relying in part on section 4(b). *Id.* The court held that they could not maintain such a claim because the action plan provided a specific standard. *Id.* So *Springfield* at least suggests that when a defendant's conduct is governing by a specific authority, a section 4(b) claim is unavailable. But *Springfield* does not answer the more basic question whether, as here, a section 4(b) claim can be pleaded in the alternative where no specific standard governs the defendant's conduct.

In the absence of guidance from the Third Circuit and New Jersey Supreme Court, the Appellate Division and courts in this District have come to disparate conclusions. On one hand, the Appellate Division has explained that "[s]ection 4b allows an action for equitable relief in those circumstances where no specific violation of a statutory or regulatory standard can be alleged, but environmental harm . . . is allegedly threatened." *Patterson v. Vernon Twp. Council*, 901 A.2d 411, 413 (N.J. Super. Ct. App. Div. 2006); *see also DiLeone v.*

23

*Township of Mahwah*, 2010 WL 770964, at *8 (N.J. Super. Ct. App. Div. Mar. 9, 2010) (plaintiffs could still pursue ERA claim under section 4(b) after their expert admitted that defendants had not violated any statute). On the other hand are cases stating that a predicate violation is essential to *any* ERA claim. *See, e.g.*, *Super. Air Prods. Co. v. NL Indus., Inc.*, 522 A.2d 1025, 1032 (N.J. Super. Ct. App. Div. 1987) ("ERA does not itself provide any substantive cause of action."); *Bowen Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 479 (D.N.J. 1992) ("the right of a private actor to sue under the ERA is limited" and requires a predicate violation).[9] Thus, there is no consensus to rely on.

Without case law squarely resolving the issue, I interpret section 4(b) fresh. I begin with its text, *Ridgefield*, 236 A.3d at 932, that provides as follows:

> Except in those instances where the conduct complained of constitutes a violation of a statute, regulation or ordinance which establishes a more specific standard for the control of pollution, impairment or destruction of the environment, any person may commence a civil action . . . for declaratory and equitable relief against any other person for the protection of the environment . . . from pollution, impairment or destruction.

N.J. Stat. Ann. § 2A:35A-4(b). A plain-text reading indicates that in circumstances where a defendant may not be violating a specific predicate law but may nonetheless be harming the environment, the plaintiff can still bring an ERA claim. The question in such a case is whether the defendant is polluting, impairing, or destroying the environment, rather than whether the defendant is violating a predicate law.

Section 7 appears to confirm this reading. *See Tumpson v. Farina*, 95 A.3d 210, 219 (N.J. 2014) ("Each statutory provision must be viewed not in isolation but in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme." (quotation marks and citation omitted)). Section 7 provides that, in section 4(b) cases, the court "shall

---

[9]     My own previous opinion stated that "[t]he ERA requires an underlying violation." *Lincoln I*, 2020 WL 563634, at *5. I was speaking, however, in the context of a claim that was based on a predicate violation; Lincoln had not raised a standalone section 4(b) claim.

adjudicate the impact of the defendant's conduct on the environment and on the interest of the public therein." N.J. Stat. Ann. § 2A:35A-7(b). Section 7 also provides that the court shall not permit a defendant to continue its conduct if "there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare." *Id.* § 2A:35A-7(a). By providing specific standards for a section 4(b) case, which would otherwise perhaps be superfluous, section 7 suggests that section 4(b) provides for a separate action with different legal standards.[10]

As further confirmation, I look to legislative history (although not, of course, in derogation of the statutory wording itself). *Ridgefield*, 236 A.3d at 932. The New Jersey State Bar Association Committee on State Legislation reviewed the bill and recommended its passage, and courts have relied on the Committee's report when construing the ERA. *Super. Air Prods.*, 522 A.2d at 1031–32; *Ironbound Health Rights Advisory Comm'n v. Diamond Shamrock Chem. Co.*, 523 A.2d 250, 254–55 (N.J. Super. Ct. App. Div. 1987). The Committee's report stated that "[an ERA] action may be of two kinds: (1) to enforce or restrain the violation of any statute, regulation or ordinance on the subject; and (2) for declaratory and equitable relief where no statute, regulation or ordinance establishes a specific standard for environmental controls." N.J. State Bar Ass'n, Comm. on State Legis., *Report on Assembly Bill 1245* at 1 (Apr. 11. 1974). Thus, this report indicates that legislators understood that the ERA

---

[10]      One contrary consideration might be fear that an amorphous standard of harm-to-the-environment would lead to frivolous or unmanageable lawsuits. But the Legislature seemed to anticipate that concern and (1) provided that the standards for what constituted pollution are specific, N.J. Stat. Ann. § 2A:35A-3(b), (2) granted courts authority to weed out frivolous lawsuits, *id.* § 2A:35A-4(c) and (3) allowed fee-shifting, *id.* § 2A:35A-10(a). *See also* N.J. State Bar Ass'n, Committee on State Legislation, *Report on Assembly Bill 1245* at 5 (Apr. 11. 1974). That the Legislature anticipated and made provisions for lawsuits based on a broad standard confirms that section 4(b) indeed provides for a claim independent of any predicate law.

created two types of actions, and that the second did not require a predicate violation.[11]

All said then, section 4(b)'s text, place in the statutory scheme, and legislative history show that Lincoln may maintain a separate section 4(b) claim. To the extent Hartz and NY Waterway move to dismiss Count 7 on the ground that it does not, their motion is denied.

**E. Looking Forward**

I take stock of where the foregoing analysis leaves us. Count 4, the ERA section 4(a) claim, is dismissed because the Amended Complaint fails to plead any predicate violations. Counts 5 and 6, though pleaded as separate counts, are dismissed for the same reason. Count 7 survives because it does not require any predicate violations.

Counts 1, 2, and 3 are tort claims that rely in part on statutory violations. To the extent they so rely, they are dismissed. While I have not always opted to dismiss parts of claims, in this context I find that to do so would streamline the case and assist in its management. *See loanDepot.com v. CrossCountry Mortg. Inc.*, 399 F. Supp. 3d 226, 235 (D.N.J. 2019) ("Courts in this circuit have routinely dismissed sub-theories contained within a claim while allowing other sub-theories to survive.").

I also assess where these dismissals leave us in terms of jurisdiction. *See Guerra v. Consolidated Rail Corp.*, 936 F.3d 124, 131 (3d Cir. 2020) (federal courts have "an independent obligation to determine whether subject-matter jurisdiction exist[s]" at all stages (citation omitted)). The parties are not diverse (Am. Compl. ¶¶ 2–5), so at least one of the remaining claims must present a

---

[11]     Additionally, while not quite legislative history, the Minnesota Court of Appeals explained, when interpreting the Minnesota version of ERA, that multiple states, including New Jersey, adopted these statutes around the same time and modeled them after one another. *McGuire v. County of Scott*, 525 N.W.2d 583, 585 (Minn. Ct. App. 1994). These statutes, the court continued, all provided dual causes of action, one for predicate-law violations and another for when no predicate-law violations could be found. *Id.*

federal question. Count 7 is a state-law claim. Counts 1, 2, and 3, while sounding in tort, are unclear as to what law they are based on, referencing state, federal, and maritime law. They cannot be federal-law claims because, to the extent they relied on federal-law violations, those theories have been dismissed. *See Gunn v. Minton*, 568 U.S. 251, 258 (2013) (explaining how state-law claims that raise federal issues can qualify for federal-question jurisdiction). Nor do they invoke federal common law.

That leaves maritime law. Federal courts have jurisdiction over any "civil case of admiralty or maritime jurisdiction," 28 U.S.C. § 1333(1), which "extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land," 46 U.S.C. § 30101(a). Section 30101(a) requires that tort claims satisfy a location and connection test. The location test requires that "the tort occurred on navigable water or the injury suffered on land was caused by a vessel on navigable water." The connection test requires (1) "assess[ing] the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce, and (2) "determine[ing] whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Matter of Christopher Columbus, LLC*, 872 F.3d 130, 133–34 (3d Cir. 2017) (quotation marks and citations omitted).

The requirements appear satisfied. The tort here is unreasonable ferry activity, which occurred on the Hudson River, a navigable water. This incident has a potentially disruptive impact on maritime commerce because the frequent and substantial wakes have damaged a marina and thereby impacted boat-owners' river access. Finally, ferrying is a traditional maritime activity. Thus, I conclude that I have jurisdiction over Counts 1, 2, and 3 as an exercise of maritime jurisdiction. As a result, there is at least one basis for an exercise supplemental jurisdiction over Count 7.

**F. Attorney's Fees**

Finally, Hartz and NY Waterway request attorney's fees, assuming they prevail on their motion to dismiss the ERA claims. (Mot. at 36–37.) *See Lincoln I*, 2020 WL 563634, at *10. I decline to award fees at this time because (1) Lincoln's section 4(b) claim has not been dismissed, and (2) the dismissal of the section 4(a) claims are without prejudice.

## IV.   CONCLUSION

For the reasons set forth above, the motion to dismiss is granted as to Counts 1, 2, and 3, to the extent those claims rely on statutory violations. The motion is granted as to Counts 4, 5, and 6 in their entirety. The motion is otherwise denied, as is the request for attorney's fees.

A separate order will issue.

Dated: February 5, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**