UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LINCOLN HARBOR ENTERPRISES, LLC; LINCOLN HARBOR YACHT CLUB, | : : : : : | |
| Plaintiffs, | : : | Civil Action No. 19-12520 (BRM)(MAH) |
| v. | : : : | |
| HARTZ MOUNTAIN INDUSTRIES, INC.; PORT IMPERIAL FERRY CORP. d/b/a NY Waterway, | : : : : | OPINION & ORDER |
| Defendants. | : : | |

**Hammer, U.S. Magistrate Judge**

This matter comes before the Court by way of a joint discovery-dispute letter that the parties filed on October 8, 2024 [D.E. 170]. The Court has considered the respective positions of the parties, as well as the January 31, 2024, report of Defendant New York Waterway's ("NYW") testifying expert, Commander John H. Olthuis, D.E. 167-9, and the pertinent testimony from the September 19, 2024, deposition of Commander Olthuis, D.E. 170-1.

The dispute concerns disclosures that Plaintiffs Lincoln Harbor Enterprises LLC ("LHE") and Lincoln Harbor Yacht Club ("LHYC") seek in conjunction with Commander Olthuis's expert report, pursuant to Federal Rules of Civil Procedure 26(a)(2)(b)(ii) and 37(a)(3)(A). Specifically, Plaintiffs seek an order that compels NYW to produce:

> Historical Automatic Identification System (AIS) data for all vessels transiting the Hudson River, bank to bank, between latitude 40 degrees 44' 19.7" N and 40 degrees 46' 37.7" N during the five-year period January 1, 2015 through December 31, 2019 and January 1 through November 30, 2023.

1

*See* NYW's Responses and Objections to Plaintiff's Request for Production of Documents Relating to John H. Olthuis Expert Report, D.E. 167-10, at 3. NYW objects that the request (1) is overly broad and burdensome, (2) seeks documents that Defendants have already produced, and (3) seeks documents on which Commander Olthuis did not rely in preparing his expert report. *Id.* at 4. Because the Court concludes that Commander Olthuis did not "consider" the data that Plaintiffs seek under Rule 26(a)(2)(b)(ii), the Court will deny Plaintiffs' application.

I.  **Background of the Dispute**

Lincoln Harbor Marina consists of condominiums and marina slips situated on the Hudson River, in Weehawken, New Jersey. LHE owns Lincon Harbor Marina, and LHYC manages it. In 1988, as Defendant Hartz Mountain Industries was developing other parts of the adjacent area, known as Lincoln Harbor, it received approval from the Army Corps of Engineers to construct two ferry slips. Thereafter, New York Waterway began to operate a ferry service from those slips. Plaintiffs contend that in or around 1992, when New York Waterway began ferry operations, the ferry made only two trips per day. However, between 2002 and 2020, ferry traffic expanded so that the ferries now operate in fifteen to twenty-minute intervals and make approximately 37,000 trips annually. Plaintiffs allege that this increased traffic, and in particular the irresponsible manner in which NYW operates the ferries, have caused boat wakes that have damaged Lincoln Harbor Marina, rendered boat slips unusable, created noise pollution, and created environmental issues. Accordingly, Plaintiffs seek both monetary damages and equitable relief.

Defendant New York Waterways has produced an expert report by Commander John H. Olthuis, concerning whether NYW's ferry operations comported with industry standards.

2

Commander Olthuis is a commissioned United States Coast Guard Officer. *See* January 31, 2024 Expert Repot of John H. Olthuis ("Olthuis Report"), D.E. 167-9, at 4. From 1993 to 1996, he was the Commanding Officer for Coast Guard Vessel Traffic Service—New York and the Chief of the Waterways Management Division—New York. *Id.* at 4-5. Commander Olthuis's area of expertise concerns appropriate ship operations and analysis of the forces impacting the lower Hudson River, where Lincoln Harbor Marina is located. That includes consideration of how conditions such as wind, the tides, river current, and boat traffic impact the waterway. *Id.* at 1. To conduct this analysis, Commander Olthuis relied on AIS data "to reconstruct the tracks and speeds of all New York Waterway (NYW) ferries on more than 120 randomly selected days spanning over a five-year period between 2015 and 2019." *Id.* An automatic identification system is essentially a transponder operating on a VHF maritime band that transmits a ship's position so that other ships are aware of it and can navigate safely. Navigation Center, United States Coast Guard, Automatic Identification System (AIS) Overview, https://www.navcen.uscg.gov/automatic-identification-system-overview (last visited December 26, 2024). An AIS device can transmit a ship's location, identity, speed of travel, and course to both satellites and ground receivers. That data is then broadcast to vessel traffic operation centers and others. It is also available to the public on a real-time basis and historical basis, on websites such as www.vesselfinder.com.

In his January 31, 2024 report, Commander Olthuis stated that he "reviewed the following documents in formulating my analysis and opinions . . . . 16. Historical Automatic Identification System (AIS) data for all vessels transiting the Hudson River, bank to bank, between latitude 40º 44' 19.7" N and 40º 46' 37.7" N during the five-year period January 1, 2015 through December 31, 2019 and January 1 through November 30, 2023." Olthuis

Report at 5-6.  He procured the data from VesselFinder, via its website www.vesselfinder.com, for a fee of $4880.  *Id.* at 6; VesselFinder Invoice, Sept. 19, 2023, D.E. 170-2.  There is no dispute that Commander Olthuis received all the AIS data that Plaintiffs request from www.vesselfinder.com, and that he still possesses that data.  Joint Letter, D.E. 170, at 2.  There also is no dispute that this data is publicly available on the vesselfinder.com website.

Commander Olthuis's expert report did not include or discuss the entirety of that data.  Instead, both the expert report and Commander Olthuis's deposition testimony reflect that once he received the production from www.vesselfinder.com, Commander Olthuis randomly selected twenty-four days for each year of 2015 through 2019, for a total of 120 days of analysis.  Olthuis Report at 11.  *See also* Dep. Tr. of John H. Olthuis ("Olthuis Dep."), D.E. 170-1, at 174:2 to 174:15 (testifying that he randomly selected the days by "put[ting] numbers in a bag and my wife picked them out of a bag.  We shook them each time, and I came up with the dates that I would analyze. . . . that's how I generated it.").  The data from these 120 days that Commander Olthuis selected form the basis of the analysis and opinions in his expert report.  Commander Olthuis did not examine the other data, or provide it to NYW's lawyers.  *Id.* at 176:12 to 176:176:17; 178:12 to 178:21.  Similarly, Commander Olthuis's expert report does not suggest that he examined AIS data other than the 120 randomly selected days, or that his opinions relied on that other data.

Commander Olthuis opined that the AIS data he analyzed did not support Plaintiffs' assertions that the NYW ferries operated negligently or recklessly, or that the ferries' operations caused unreasonably destructive and dangerous wakes.  Olthuis Report at 11.  Commander Olthuis further opined that the NYW ferries "operated with a reasonable standard of care."  *Id.* at 12.  For example, Commander Olthuis relied on the 120 days of AIS data

4

between 2015 and 2019 to opine that the average speed of the NYW ferries within the Hartz Channel was 7.15 knots, which "cannot be considered excessive, unseamanlike, or reckless especially when one considers that many of the daily average speeds were most likely impacted by environmental factors such as wind and current." *Id.* at 13.  He allowed, however, that the AIS data he examined showed instances, which he termed "outliers," of ferries leaving the main channel early and travelling within the Hartz Channel at a faster speed.  *Id.*

NYW has produced the complete AIS data for those 120 days to Plaintiffs.  However, NYW has not produced the remaining AIS data.  Joint Letter, D.E. 170, at 2; Olthuis Dep. at 168:18 to 169:3.  The dispute is whether NYW should have to produce the remaining AIS data in Commander Olthuis's file for 2015-2019 and 2023.

Plaintiffs contend that Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires Commander Olthuis to disclose the remaining AIS data for 2015-2019 and 2023.  Plaintiffs argue that whether Commander Olthuis actually reviewed or factored the remaining AIS data in formulating his analysis and opinions is irrelevant, because Commander Olthuis nonetheless "considered" that data under Rule 26(a)(2)(B)(ii).  Plaintiffs argue that because Commander Olthuis obtained the contested AIS data from VesselFinder along with the 120 days of AIS data on which he based his analysis, that data "relates directly to the facts and opinions expressed by CDR Olthuis," even if Commander Olthuis relied on only a subset of the AIS data.  Joint Letter at 4.

NYW argues that because Commander Olthuis "did not review, read, process, analyze or consider the remainder of the data that he acquired from vesselfinder[,]" he did not consider it under Rule 26(a)(2)(B)(ii), and therefore NYW has no obligation to produce it.  *Id.*

5

at 6. NYW also contends that Plaintiffs cannot claim actual deprivation of the data if NYW does not produce it, because the data is equally available to Plaintiffs through www.vesselfinder.com. *Id.*

**II.   Discussion**

Under Rule 26(a)(2)(B), an expert whom a litigant has retained to provide expert testimony must serve a written report that includes, among other things, "the facts or data considered by the witness in forming" that witness's opinions and their basis. Fed. R. Civ. P. 26(a)(2)(B)(ii). If an expert fails to make the disclosures that Rule 26(a)(2)(B) requires, the adversary may seek disclosure pursuant to Rule 37(a)(3)(A).

What constitutes "considered" has been the subject of numerous federal court decisions. As reflected in *Synthes Spine Co., L.P. v. Walden*, most courts have attached a broad interpretation to "considered" by requiring the production of any information that the expert "generates, reviews, reflects upon, reads, and/or uses in connection with the formulation of his opinions, even if such information is ultimately rejected." 232 F.R.D. 460, 463 (E.D. Pa. 2005). The court adopted that approach in *In re. Benicar (Olmesartan) Prod. Liab. Litig.*, reasoning that such an approach comported with the Advisory Committee notes to the 2010 amendments to Rule 26(a)(2)(B). 319 F.R.D. 139, 140-41 (D.N.J. 2017) (quoting 2010 Advisory Committee Note to Fed. R. Civ. P. 26(a)(2)(B)). The 2010 Advisory Committee notes commented that the 2010 amendments were intended to focus production obligations on "facts or data" considered by the expert witness, so as to obviate issues concerning disclosure of counsel's mental impressions and foster broad disclosure of factual materials.

In *Allstate Ins. Co. v. Electrolux Home Prods., Inc.,* the court explained the distinction between "considered" in Rules 26(a)(2)(B)(ii) and 26(b)(4)(C)(ii), and "relied upon" in Rule 26(b)(4)(C)(iii).  840 F. Supp.2d 1072, 1080 (N.D. Ill. 2012).  That court reasoned that "'considered' invokes 'a broader spectrum of thought than the phrase 'relied upon' which requires dependence on the information. . . . While 'consider' is to be given a broad meaning, the Seventh Circuit suggests that "considered' applies to that information an expert actively reviews and contemplates, and then chooses not to rely upon."  *Id.* (citations omitted).  This standard is not unlike the "objective test" on which Plaintiffs rely.  *See In re. Mirena Prods. Liab. Litig.*, 169 F. Supp.3d 396, 471-72 (S.D.N.Y. 2016) (holding that "considered" includes any facts or data that the expert learns concerning the subject matter of the expert opinion, before that opinion is rendered); *Genesis Health Care Corp. v. Lexington Ins. Co.*, Civ. No. 08-3923, 2010 WL 11570368, *2 (D.N.J. Apr. 16. 2010) (applying objective test to require disclosure of related materials with which expert was familiar and consciously chose not to incorporate into analysis).

In *Kaisha v. Lotte International America Corp.*, the court applied similar reasoning to decline an application by defendants to compel plaintiff's expert to produce pre-existing surveys in a trademark infringement matter.  Civ. No. 15-5477, 2019 WL 13258468 (D.N.J. Jan. 23, 2019).  The plaintiff had retained the expert to design and implement a survey to measure the likelihood of confusion between the plaintiffs' product and defendants' product.  At the time of retention, the expert was still a director of the research firm, NERA Economic Consulting.  While designing and conducting the surveys for plaintiff, the expert left NERA.  The defendant sought surveys that NERA had conducted before the likelihood-of-confusion surveys that the expert conducted for plaintiff.  The defendant reasoned that because NERA

had conducted those prior surveys, and NERA researchers assisted the expert in conducting the likelihood-of-confusion surveys underlying his report in *Kaisha*, the expert must have considered those prior surveys in conducting the relevant surveys and drafting his expert report. *Id.* at *1. The court rejected defendant's request. *Id.* at *2. The court concluded that the expert's sworn assertions that he did not review, read, or rely on any other survey information in conducting the relevant surveys or drafting his report outweighed the fact that NERA researchers had assisted the expert. *Id.*

Commander Olthuis did not consider the AIS data that Plaintiffs seek. First, nothing in Commander Olthuis's expert report suggests that he examined AIS data other than the 120 randomly selected days, or that his opinions relied on that other data. To the contrary, both the expert report and Commander Olthuis's sworn testimony establish that he randomly selected twenty-four days for each year of 2015 through 2019, for a total of 120 days of analysis. Olthuis Report at 11. *See also* Dep. Tr. of John H. Olthuis ("Olthuis Dep."), D.E. 170-1, at 174:2 to 174:15. Therefore, he neither considered the remaining data from VesselFinder, nor consciously excluded or refused to consider any particular data from VesselFinder. There also is no showing that Commander Olthuis even knows the substance of the AIS data that was not selected. Commander Olthuis's deposition testimony establishes that he never examined the remaining AIS data, or provide it to NYW's lawyers. *Id.* at 176:12 to 176:176:17; 178:12 to 178:21.

Application of the objective test urged by Plaintiffs does not compel a different result. Plaintiffs rely on *In re Mirena IUD Prods. Liab. Litig.* for the proposition that "considered" includes "any facts or data on the subject matter learned by the expert at any time before rendering [the] opinion." 169 F. Supp.3d at 471-72. That case was a multi-district liability

8

matter concerning allegations that the defendant-manufacturer's intrauterine devices caused perforation. Plaintiffs sought to exclude the defendant's regulatory expert, Dr. Dena Hixon, on the basis that, among other things, Dr. Hixon failed to disclose all facts that she had considered in forming her opinions. *Id.* at 468. The material at issue was Dr. Hixon's past work as a regulatory reviewer of Mirena. *Id.* at 470-71. Dr. Hixon's report acknowledged that her opinions were partly based on her experience as a regulatory reviewer, and that her experience at the Food and Drug Administration with the product likely would "bleed into" her expert opinions. *Id.* at 471.

The facts in *In re Mirena IUD Prods. Liab. Litig.* are easily distinguishable. In contrast to Dr. Hixon, nothing in the record, or in Plaintiffs' arguments, suggests that Commander Olthuis learned anything about the AIS data that he excluded, much less that it factored into his opinion. And there is nothing to suggest that Commander Olthuis knew the contents of that AIS data, but consciously refused to consider it. In short, the record here falls well short of establishing that Commander Olthuis "learned" the AIS data beyond the 120 days that were randomly selected and incorporated into his report. *In re. Mirena Prods. Liab. Litig.*, 169 F. Supp.3d at 471.

Plaintiffs also rely on *Genesis Health Care Corp. v. Lexington Ins. Co.*, Civ. No. 08-3923, 2010 WL 11570368 (D.N.J. Apr. 16, 2010). But that case is also distinguishable and does not support the Plaintiffs' request. In *Genesis Health Care*, the court reasoned that information provided by an attorney to the expert in a coverage matter met the definition of "considered" because the information had been relayed to the expert and "the subject matter of counsel's coverage opinions plainly addressed the same subject matter as the expert's opinions." *Id.* at *3. In short, once the attorney conveyed the information to the expert, the

9

expert was aware of it and either had to rely on it, or consciously disregard it, which constitutes "considered" under Rule 26(a)(2)(b)(ii). That is not the case here. Nothing in the record suggests that Commander Olthuis ever learned the contents of the AIS data outside of the 120 days that he considered. To the extent Plaintiffs rely on *Euclid Chemical Co. v. Vector Corrosion Technologies Inc.,* No. 1:05cv80, 2007 WL 1560277, *3-4 (N.D. Ohio May 29, 2007), that case is also similarly distinguishable.

For those reasons, the Court will deny Plaintiffs' application for an Order compelling NYW to produce the historical AIS data for 2015 through 2019 and 2023, beyond the AIS data for the 120 randomly selected days that NYW has already produced. To be clear, Plaintiffs are not without recourse to obtain the same information. The data they seek from NYW is readily available from VesselFinder for a relatively modest fee.

Accordingly, Plaintiffs' application for an Order compelling NYW to produce the historical AIS data for 2015 through 2019 and 2023, beyond the AIS data for the 120 randomly selected days that NYW has already produced is **DENIED**.

**It is SO ORDERED on this 27th day of December 2024.**

Michael A. Hammer  
United States Magistrate Judge
